# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
### Indianapolis Division

| | |
|---|---|
| In re:<br><br>**DAVID R. O'FLYNN**,<br><br>*Debtor*. | )<br>)<br>)<br>)   Case No. 12-13117-RLM-13<br>)<br>) |

_____

| | |
|---|---|
| **DAVID R. O'FLYNN, et al.**, *on behalf of*<br>*themselves and all others similarly situated,*<br><br>*Plaintiffs*,<br><br>v.<br><br>**PHH MORTGAGE CORPORATION,** successor<br>by merger with Ocwen Loan Servicing, LLC.,<br>**OCWEN FINANCIAL CORPORATION**, and<br>**ALTISOURCE PORTFOLIO SOLUTIONS, SA**<br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)   Adversary No.<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## CLASS ACTION COMPLAINT,  DEMAND FOR JURY TRIAL, AND MOTION FOR CONTEMPT AND SANCTIONS FOR VIOLATION OF THE DISCHARGE INJUNCTION AND FRBP 3002.1(i)

_____

Plaintiffs, David R. O' Flynn ("O' Flynn"), Donald L. Wilhold ("Wilhold"), and James and Regina Addison ("the Addisons") (collectively, the "Plaintiffs"), themselves and on behalf of all others similarly situated, by and through undersigned counsel, complain of Defendants, PHH Mortgage Corporation, successor by merger to Ocwen Loan Servicing, LLC., Ocwen Financial Corporation (collectively, "Ocwen"), and AltiSource Portfolio Solutions, S.A. ("AltiSource")(collectively, the "Defendants") as follows:

### INTRODUCTION

1.      This case concerns fraudulent practices committed by Ocwen and AltiSource in connection with the servicing of home mortgage loans involved in Chapter 13 bankruptcy proceedings.  Specifically, Defendants have engaged in a common scheme involving the creation and collection of fees, costs, charges and other amounts in circumvention of the Bankruptcy Code and in violation of federal consumer protection statutes. This scheme has resulted in countless borrowers and debtors like the Plaintiffs completing the rigid requirements of a Chapter 13 bankruptcy only to be denied the "fresh start" to which they were entitled. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367, 127 S. Ct. 1105, 1107, 116 L. Ed. 2d 956  (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'") (internal citation omitted).

2.      Specifically, the conduct complained of herein is alleged to be in violation of Fed. R. Bank. P. 3002.1, 11 U.S.C § 362(a), and 11 U.S.C § 524(i) in relation to the underlying bankruptcy proceedings but also independently violative of the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C §1962(c); the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C §1692k; and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C §2605.

3.      When home mortgage borrowers fall behind on their payments, in addition to assessing late fees, Ocwen obtains ancillary services which are purportedly designed to protect the lender's interest in the property and permitted by the underlying mortgage and note. To obtain these services, Ocwen historically funneled all of the work through AltiSource who then ordered the services using a network of third-party vendors.

4.      As a matter of practice, and with little to no oversight, AltiSource marked up the third-party vendors' charge for their services, and then passed along the charges to Ocwen. Without

obtaining verification the services were permitted by the underlying loan (or actually provided), and without notifying the Bankruptcy Court in accordance with Rule 3002.1, Ocwen has collected and continues to seek to collect "reimbursement" for these services, alleged escrow deficiencies, alleged payment delinquencies, and unilaterally increased principal balances.

5.     To execute this scheme, Ocwen long utilized a system of record called REALServicing to manage its entire core servicing functions and record keeping - a program maintained and provided by AltiSource. Despite Ocwen and AltiSource's specific knowledge of REALServicing's inability to appropriately apply trustee conduit payments, ensure completion of requisite escrow notices and analyses, or ensure the timely and accurate filing of bankruptcy related documents, they continued to use the program without material modification.

6.     By information and belief, the Defendants' scheme was designed to avoid detection from the outset, concealed via the material misrepresentations and conduct detailed below, and maintained to generate and collect revenue they otherwise could not. As one court has explained:

> Lenders have apparently been operating under the assumption that the fees and costs [they seek to collect upon] are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time . . . [T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees . . . .

*In re Prevo*, 394 B.R. 847, 848, 851 (Bankr. S.D. Tex. 2008) (emphasis added).

## JURISDICTION AND VENUE

7.     This matter is, in part, a core proceeding arising out of the above-captioned Chapter 13 cases and under Title 11 of the United States Code and concerns Defendants' willful and intentional failure to comply with this Court's orders implementing the discharge injunction.

8.     This Court has both personal and subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

9.     Because this matter is in part a core proceeding, this Court has jurisdiction and authority to enter a final order. Plaintiffs consent to the same.

10.     This Court has original jurisdiction of this class action under 28 U.S.C. § 1332(d)(2). Defendant Ocwen is a Florida citizen, Defendant AltiSource is a Georgia citizen, and Plaintiffs are Indiana citizens.  Plaintiffs represent a class of more than 100 members in which more than five million dollars ($5,000,000) is in controversy.

11.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as each of the Plaintiffs' bankruptcy cases were filed in this District, Defendants do business in this District,  and the conduct which gives rise to the claims asserted herein occurred within this District.

## **PARTIES**

12.     AltiSource is an asset management company primarily focused on the provision of ancillary services to Ocwen.

13.     Ocwen Financial Corporation is a financial services holding company, which, through its subsidiaries, services consumer mortgage loan accounts.[1] Ocwen Financial Corporation has published and maintains a website, where it states:

About Us

---

[1]  Mortgage servicers are the companies that interact with borrowers after the closing of a mortgage loan. In the rarest of circumstances, the same financial institution will originate, own, and service a residential mortgage loan. In today's economy, the dominant business model is that after origination, new mortgage loans are packaged together and sold to the government-sponsored enterprises ("GSE's")  Fannie Mae, Freddie Mac, VA, or FHA, and rarely to private investors. The GSE's or private investors then sell the mortgage servicing rights to mortgage servicers and enter into contractual agency relationships authorizing the mortgage servicers to collect payments from borrowers, handle accounts involved in bankruptcy proceedings or foreclosures, communicate  with borrowers, and distribute payments to the investors. An incredibly large percentage of Ocwen's profit is derived from the collection of fees, costs, and charges. A very small percentage of Ocwen's profit is derived from its basic servicing functions.

Ocwen Financial Corporation (NYSE: OCN) is a leading non-bank mortgage servicer and originator providing solutions through its primary brands, PHH Mortgage and Liberty Reverse Mortgage. PHH Mortgage is one of the largest servicers in the country, focused on delivering a variety of servicing and lending programs. Liberty is one of the nation's largest reverse mortgage lenders dedicated to education and providing loans that help customers meet their personal and financial needs. Ocwen and its subsidiaries are committed to helping homeowners and delivering exceptional service and value to customers, clients and investors.[2]

14.     Ocwen focuses on the servicing of subprime loans, which are loans owed by borrowers with lower credit scores or who have experienced some manner of delinquency.

15.     As of December 31, 2016, Ocwen serviced 1,393,766 loans with an aggregate unpaid balance of approximately $209 billion.

16.     As of September 30, 2020, Ocwen employed approximately 5,200 employees; 3,700 overseas in support of its loan servicing operations.

17.     PHH Mortgage is a wholly owned subsidiary of Ocwen Financial Corporation.

18.     In late 2018, Ocwen Financial Corporation reached a merger deal with PHH Mortgage. As part of that deal, Ocwen merged its mortgage servicing operations into PHH and began to perform its mortgage servicing operations in the name of PHH Mortgage.

19.     As a result of this merger, Ocwen Financial Corporation ceased servicing mortgage loans through Ocwen Loan Servicing, LLC or using the Ocwen name.

20.     Plaintiffs were each debtors in a Chapter 13 bankruptcy proceeding.

21.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise or scheme, the allegation means that Defendants engaged in the act, deed, or conduct by and through one or more of their officers, directors, agents, employees or representatives, each of whom were actively engaged in the

---

[2] *About Us*, OCWEN, https://www.ocwen.com/About (last visited August 16, 2021).

management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

## CLASS ACTION ALLEGATIONS

22.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action individually and on behalf of a class initially defined as follows (hereinafter, "Class"):

> Chapter 13 Class: All individuals who were debtors in a Chapter 13 bankruptcy proceeding wherein an Order of Discharge was entered from August 27, 2015 to present whose first or second residential mortgage loan was serviced by Ocwen Loan Servicing, LLC. during the pendency of their bankruptcy proceedings, Ocwen Loan Servicing, LLC. or PHH Mortgage Corporation at the time the Order of Discharge was entered, and who thereafter received some form of communication from Ocwen Loan Servicing, LLC. or PHH Mortgage Corporation regarding any fees, costs, charges, escrow deficiency, or delinquency predating the Order of Discharge.

23.     Subclasses. The Class contains the following subclasses within it:

> Unjust Enrichment Subclass: All individuals who were debtors in a Chapter 13 bankruptcy proceeding wherein an Order of Discharge was entered in the Southern or Northern District of Indiana from August 27, 2015 to present whose first or second residential mortgage loan was serviced by Ocwen Loan Servicing, LLC during the pendency of their bankruptcy proceedings, Ocwen Loan Servicing, LLC. or PHH Mortgage Corporation at the time the Order of Discharge was entered, and who thereafter paid any amounts to Ocwen Loan Servicing, LLC. or PHH Mortgage Corporation, whether directly or via refinance, associated with any fees, costs, charges, escrow deficiency, increased principal balance, or delinquency predating the Order of Discharge.

24.     Exclusion. Excluded from the Class are all Defendants, all local, state, and federal governments and their agencies, any Indian tribe, and the presiding judge.

25.     Numerosity. The members of the Class are so numerous that joinder of all

would be impractical. Ocwen is one of the largest subprime mortgage servicers in the country and its presence is proportionally represented in the docket for this Court. A PACER search indicates Ocwen's name is associated with thousands of cases in this district and tens of thousands of cases nationally. Hundreds of those cases will be within the class period. The Class is easily ascertainable as the name and an address of all class members has been or can be identified in records maintained by either or all of the following: Ocwen, PACER, the Chapter 13 Trustee's Office, the National Data Center, and the U.S. Trustee for the Southern District of Indiana.

26.    <u>Existence and Predominance of Common Questions of Fact</u>. Common questions of fact exist as to all members of the Class. These  questions predominate over the questions affecting only individual members. The common factual questions include without limitation:

a.    The Defendants policies and procedures for servicing loans involved in a Chapter 13 bankruptcy proceeding;

b.    AltiSource's policies and procedures for ensuring ancillary services were actually performed by third party vendors;

c.    The identify and number of Defendants' common managers and executives at all relevant times;

d.    The identity and extent of Defendants' common ownership at all relevant times;

e.    The extent and timing of Defendants' knowledge of "deficiencies" or regulatory risk associated with REALServicing as related to the conduct alleged herein including without limitation the contents of its Risk Convergence Reports/Spreadsheets and the monitor reports prepared by The StoneTurn Group and Goldin Associates, LLC. ;

f.  Ocwen's rationale for extending its agreement with AltiSource for the continued use of REALServicing;

g.  What steps Defendants took to address known "deficiencies" associated with REALServicing, including without limitation what software updates were performed and what procedural safeguards were instituted as related to debtors involved in a Chapter 13 bankruptcy;

h.  The frequency at which debtors with loans serviced by Ocwen exit Chapter 13 bankruptcy proceedings with some instance of delinquency, unapproved fees, negative escrow accounts, negative suspense balances, improper payment applications, and increased principal balances;

i.  Whether the Defendants' statements, documents, public announcements, and representations in prior litigation contained knowingly false information designed to conceal the conduct at issue;

j.  Whether Defendants had a policy or practice of making false or incomplete statements to bankruptcy courts or other tribunals based on documents they knew likely contained material inaccuracies;

k.  Whether Defendants sought to conceal the conduct at issue herein by decommissioning REALServicing in a manner to ensure life of loan data can no longer be obtained in native format and last change date information; and

l.  Whether and to what extent Ocwen engaged in a concerted effort to modify loans to conceal the conduct at issue;

    m. Whether Ocwen provided borrowers involved in a Chapter 13 bankruptcy with any notice or information about the likelihood their loans could have been subject to the servicing errors described herein;

    n. Whether and to what extent Ocwen audited loan data being transferred to BlackKnight MSP.[3]

27. <u>Existence and Predominance of Common Questions of Law</u>. Common questions of law exist as to all members of the Class. These questions predominate over the questions affecting only individual members. The common legal questions include without limitation:

    a. Whether Defendants' conduct was in knowing violation of discharge injunctions;

    b. Whether Defendant's conduct was in violation of the automatic stay or Fed. R. Bank. P. 3002.1;

    c. Whether the Defendants engaged in a pattern and practice of racketeering, as alleged herein;

    d. Whether Defendants have been members of an association-in-fact enterprise;

    e. Whether Defendants' statements concerning the character, amount, or legal status of Plaintiffs' loans violated the FDCPA;

    f. Whether Defendants' failure to perform escrow analyses violated the RESPA;

    g. Whether Defendants' conduct constitutes a "pattern or practice" of servicing misconduct under the RESPA;

    h. Whether Defendants' conduct was part of a joint or common scheme or enterprise to unjustly enrich themselves; and

---

[3] BlackKnight MSP is a servicing system of record widely considered to be the industry standard. In short, it does what REALServicing should have done.

    i.   Whether Defendants' have been unjustly enriched;

    j.   Whether Defendants' have fraudulently  concealed the scheme and conduct at issue;

    k.   The appropriate remedies for the harm caused by the conduct alleged herein including the appropriate penalties and punishments that should be imposed against the Defendants.

28.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of each Class member, and all are based on the same facts and legal theories. Each Class member was a participant in a Chapter 13 bankruptcy proceeding. Each Class member is alleged to have paid unlawful amounts resulting from the Defendants scheme and enterprise or now "owe" unlawful amounts resulting from the Defendants scheme and enterprise. Each class member has been the recipient of communications from Defendants with respect to the aforementioned amounts.

29.    <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in handling actions involving the Defendants, unlawful practices against consumers, bankruptcy, complex litigation, and class actions. The self-interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members. Thus, neither the Plaintiffs nor their counsel has any interest that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative class and have accepted such responsibilities.

30.    The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants, and which would, as a practical

matter, be dispositive of the interests of the other Class Members not parties to those adjudications, substantially impairing or impeding their ability to protect their interests.

31.     Defendants have acted on ground generally applicable to the Class, thereby making appropriate declaratory relief with respect to the Class as a whole.

32.     Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and Fed. R. Bank. P. 7023, is also appropriate in that:

a. The scope of the Defendants' conduct and their efforts to conceal the same make it unlikely any individual action will cause the behavior at issue to end. Further, the common facts and legal questions in the case overwhelm the more modest individual damages issues. The nature of the claims and damages sought are such that the individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. In addition, any individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve individuals who are otherwise disempowered and unable to afford and bring such claims individually. This is particularly the case with respect to consumer debtors involved in a Chapter 13 bankruptcy proceeding who have endured significant financial hardship and are unlikely to possess the financial resources necessary to retain independent counsel. Further, many of the debtors who have been harmed by the Defendants' illegal

acts have no way of easily identifying the conduct at issue or have been misled. Therefore, individual litigation of the uniform issues in this case would become an unnecessary drain of judicial resources and would be wholly ineffective as a method of remedying the massive wrongdoing practiced by Ocwen.

33.    Named Plaintiffs may maintain a class action because questions of law and fact common to Class Members predominate over any questions affecting only individual Members, and a class action is a superior method for the fair and efficient adjudication of the controversy.  A class action is superior to other available methods because:

a.    The expense and burden of isolated loan examinations and individual litigation would effectively make it impracticable for individual Class Members to seek redress for the wrongs alleged in this Complaint;

b.    This action will foster an orderly and expeditious administration of Class claims, economies of time, effort and expense, and uniformity of decision;

c.    Failure to permit this matter to proceed as a class action would be contrary to the public policy encouraging the economies of attorney and litigant time and resources; and

d.    Public policy and judicial precedent favor class actions for the purpose of, *inter alia*, deterring wrongdoing and providing judicial relief for small, individual claims with a common basis. See e.g., *Golden v. Discover Bank*, Adv. No. 20-1051, (Bankr. E.D.N.Y. July 19, 2021).

## **FACTUAL BACKGROUND**

### **The Relationship Between Ocwen and AltiSource**

34.    Plaintiffs allege the following based upon personal knowledge as to themselves

and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, but was not limited to, a review and analysis of: (i) AltiSource's and Ocwen's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) publicly available materials and presentations prepared by AltiSource and Ocwen; (iv) AltiSource's and Ocwen's press releases and media reports; (v) consultation with relevant experts; (vi) publicly available materials prepared by the SEC and the Consumer Financial Protection Bureau ("CFPB"); and (vii) Plaintiffs' counsel's experience in confronting these issues in other litigation.

35.    As stated, Ocwen long utilized a system of record known as REALServicing.

36.    Two of the most widely used systems of record are called Black Knight's MSP and FISERV. These two systems are constantly upgraded, tested, and adjusted to comply with the law and are used by many of the country's largest mortgage servicers.

37.    Aside from Ocwen, no other mortgage servicer has ever used REALServicing.

38.    REALServicing was never materially upgraded or modified.

39.    REALServicing was created and once maintained by Ocwen Solutions, formerly a wholly owned subsidiary of Ocwen Financial Corporation.

40.    In August of 2009, REALServicing and Ocwen Solutions were spun off from Ocwen Financial Corporation into a new entity called AltiSource.

41.    Upon information and belief, this spinoff was done to capture revenue associated with technology and ancillary services charges. The creation of AltiSource allowed Ocwen to create its own "default services provider" that would coordinate, for a fee, the handling of any defaulted mortgage loan account by providing a suite of services.

42.    At the time of this spinoff, Ocwen was either performing these services for itself

or retaining unrelated vendors to do so. By spinning off AltiSource, the common ownership of Ocwen and AltiSource were able to monetize ancillary services, create additional revenues, in a fashion they could not do directly.

43.     At all times relevant herein, both Ocwen and AltiSource represented that AltiSource's revenues derived from Ocwen were free of self-dealing, subject to strict internal controls, and sourced from the performance of services at market rates. These assurances extended to related party transactions and potential conflicts of interests.

44.     Ocwen is, and has always been, AltiSource's largest customer by a significant margin. In 2012, Ocwen accounted for at least 60% of AltiSource's revenue.

45.     As a percentage, AltiSource's revenue from Ocwen was 54%, 56%, and 52% for the years ended December 21, 2020, 2019, and 2018.

46.     Ocwen and AltiSource have shared, and continue to share, large overlap in executive officers and employees. In fact, on occasions these executive officers and employees were ostensibly employed by both at the same time.

47.     By information and belief, many of these executives continue to maintain close personal relationships.

48.     At the time of Ocwen's spinoff of AltiSource, William C. Erby – its Chairman of the Board – also became Chairman of the Board for AltiSource.

49.     Following Ocwen's spinoff of AltiSource, its Chief Risk Officer served in the same role for AltiSource and "reported directly to Mr. Erby in both capacities." At some point, the same Chief Risk Officer told an on-site compliance monitor that Ocwen paid his entire salary, but he did not know and apparently never asked which company paid his risk management staff.

50.     Since Ocwen's spinoff of AltiSource, William Shepro has served as AltiSource's

CEO. Previous to August of 2009, Shepro served as the President and Chief Operating Officer of Ocwen Solutions.

51.     AltiSource and Ocwen have also shared, and continue to share, large overlap in ownership. The controlling shareholders of Ocwen are or were also the controlling shareholders of AltiSource.

52.     In August of 2014, the overlap was noted in a letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Ocwen:

> As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in AltiSource. In fact, Mr. Erbey's stake in AltiSource is nearly double his stake in Ocwen: 29 percent versus 15 percent. Thus for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar AltiSource makes, his share is 29 cents.

53.     Many current and former Ocwen executives have owned and continue to own large amounts of shares in AltiSource and a large percentage of ownership of AltiSource. These include, without limitation, former CEO Ron Faris, and current Executive Vice President and Chief Servicing Officer Scott Anderson.

54.     Many current and former AltiSource directors and executives have owned or controlled and continue to own or control large amounts of shares in Ocwen and a large percentage of ownership in Ocwen. For instance, AltiSource's current Lead Independent Director Mr. Scott E. Berg is the Chief Investment Officer and Managing Partner of Deer Park Road Management, LP ("Deer Park") where "he is responsible for the firm's portfolios." Meanwhile, Deer Park is amongst the very largest owners of Ocwen at 13,356,147 shares or 10.3% of outstanding common shares.

55.     Mr. William Shepro, AltiSource's CEO, is or was a large shareholder of Ocwen.

56.     William Erbey continues to hold, directly or indirectly, one of the very largest ownership interests in both Ocwen and AltiSource.

57.     Accordingly, although Ocwen and AltiSource were designed to appear as separate entities, they are effectively joined together, operating as a continuing unit with a common purpose.

58.     Accordingly, the Defendants' common owners have profited from their common scheme.

59.     At the time of the aforementioned spinoff, Ocwen and AltiSource entered into several long-term services agreements ("Technology Product Services Agreement[s]" or "TPSAs") pursuant to which AltiSource was the exclusive provider of numerous ancillary services. The services include without limitation residential property valuation, property inspection and preservation, insurance services, IT infrastructure management, and IT services.

60.     IT services includes the provision of a technology products to handle loan servicing. Specifically, this allowed for AltiSource to lease REALServicing back to Ocwen at a handsome profit.

61.     As a result of these TPSAs, Defendants have been able to reap significant financial gain from the collection of ancillary services and Ocwen's use of REALServicing it could not otherwise.

62.     AltiSource has earned revenue for each Ocwen loan "boarded" on the REALServicing platform. In turn, the more loans "boarded" onto REALServicing, the more fees it was able to earn.

63.     Unfortunately for consumers such as the Plaintiffs, the foregoing relationship has

had several very significant consequences, such as: (a) AltiSource and its related entities have been given free reign by Ocwen to perform ancillary services with little to no oversight and entirely free from market forces; (b) the continued utilization of REALServicing; and (c) the creation of a perverse incentive to collect upon fees, costs associated with said ancillary charges, and other amounts even if in violation of law or the product of known REALServicing deficiencies.

64.     For example, REALServicing never gained the functionality to perform basic payment applications for neither loans in bankruptcy nor ensure requisite bankruptcy filings were completed timely and with accurate supporting information.

65.     Nonetheless, with full knowledge of the foregoing,  Ocwen has on several occasions extended its agreement with AltiSource for the continued use of REALServicing well before the existing agreement's expiration date and without meaningful modification or vendor evaluation.

66.     Specifically, Ocwen entered its initial agreement with AltiSource on August 10, 2009. The agreement had a term of eight years. Then, five years before said agreement was to expire, the agreement was extended without substantive change for three additional years to August 31, 2020. Then, on March 29, 2013, Ocwen again extended the contract without substantive change to August 31, 2025.[4]

67.     In the years immediately following the federal and state regulatory actions detailed below, Ocwen stated it had "invested heavily in compliance and risk management," such that its "operations [were] now mature and delivering improved controls and results," and that it

---

[4] In contrast, Ocwen entered a seven year contract with BlackKnight for the MSP servicing system. *See* BLACK KNIGHT (Nov. 1, 2017), https://www.blackknightinc.com/black-knight-announces-that-ocwen-loan-servicing-signs-seven-year-contract-for-black-knight-loansphere-msp-2/.

"expect[ed] the next round of results from the National Mortgage Settlement monitor to show that [it] ha[d] made progress in improving [its] internal testing and compliance monitoring."

68.     Inexplicably, the foregoing did not include Ocwen ceasing to utilize REALServicing, material modification to RealServicing, material modification to the TPSAs, the termination of its relationship with AltiSource, or litigation with AltiSource.

69.     On or about February 28, 2018, Ocwen announced its purchase of PHH Mortgage Corporation, a fellow nonbank servicer of distressed mortgage loans.

70.     Following the merger of the much larger Ocwen Loan Servicing, LLC into PHH, Ocwen removed any reference of its name from all borrower correspondence.

71.     On or about February 22, 2019, Ocwen and AltiSource entered a Binding Term Sheet to address the nature of their rights and obligations going forward. Pursuant to the Binding Term Sheet:

    a.   On March 1, 2019, any "remaining open issues will be escalated to Ocwen's Chief Servicing Officer [Scott Anderson] and AltiSource's Chief Executive Officer [William Shepro].

    b.   Beginning on the REALServicing Termination Date and thereafter, Ocwen will be permitted only to access the data stored within REALServicing as provided herein and will not be permitted to add, delete, modify, or otherwise change data contained therein; however, Ocwen will be permitted to query, view, read, and extract REALServicing system data, reporting and tools.

    c.   AltiSource will become the Strategic Provider (as defined below) of Standard Services (as defined below) on any and all portfolios, mortgage servicing rights,

economic rights in mortgage servicing rights and similar or associated rights for which Ocwen is a Servicer.

72.     By information and belief, the decision to decommission REALServicing was largely forced by federal and state regulators.

73.     The Binding Term Sheet was executed by Ocwen's Chief Servicing Officer Scott Anderson and AltiSource's Chief Executive Officer William Shepro.

74.     On February 27, 2019, just five days after the execution of the Binding Term Sheet, Ocwen completed the transfer of approximately 240,000 loans to BlackKnight MSP.

75.     On June 10, 2019, Ocwen announced it had completed the final phase of its loan transfer process and transition from REALServicing to Black Knight MSP. In total, Ocwen claimed to have transferred approximately one million loans to the MSP platform.

76.     Ocwen transferred approximately 760,000 loans from REALServicing to BlackKnight MSP in just over three months.

77.     Per Ocwen's own press release: "All loan transfers were executed after a significant amount of preparation, training, rigorous pre-boarding testing and customer communications."

78.     As detailed further below, these loan transfers did not include an audit or correction of the payment misapplications, continued collection of unlawful fees and costs, collection of escrow deficiencies, and manufactured states of delinquency experienced by borrowers and debtors such as the Plaintiffs. Ocwen simply transferred its data points from the corrupted RealServicing database to BlackKnight.

79.     Ocwen has never pursued legal action against AltiSource for its failure to correct

the "deficiencies: with REALServicing or for any failure to adhere to standards inherent to the TPSAs.

80.     Recently, Ocwen has represented that REALServicing is fully decommissioned and that it can no longer obtain life of loan histories from it in native format. Thus, it does not provide any borrower with complete life of loan histories in native format or with date of last change information.

81.     During the second quarter of 2020, Ocwen informed AltiSource that an MSR investor instructed it to use a field services provider other than AltiSource on certain properties. Based upon the impacted portfolios to date and the designated service provider, AltiSource believes Ocwen received this directive from NRZ.

82.     AltiSource believes Ocwen commenced using another field services provider for the NRZ properties in July 2020 and continued to transition services during the third quarter of 2020.

83.     AltiSource estimates that $70.1 million, $150.2 million, and $171.0 million of service revenue from Ocwen for the years ended December 31, 2020, 2019, and 2018, respectively, was derived from referrals on the NRZ portfolios.

84.     During the fourth quarter of 2020, Ocwen informed AltiSource that the same investor had instructed it to use a provider of ancillary services other than AltiSource on additional properties.

85.     As of the commencement of these proceedings, AltiSource had not taken any legal action to enforce the terms of the TPSAs or Binding Term Sheet despite the foregoing representing a loss of revenue potentially in excess of $200 million dollars. Instead, "[t]o address

the reduction in revenue, AltiSource is undertaking several measures to further reduce its cost structure and strengthen its operations."

## FACTUAL ALLEGATIONS PERTAINING TO PAST REGULATORY ACTIONS

86.     The Defendants' knowledge of the issues raised herein, and the longevity of their scheme, is also evidenced by past regulatory actions against them wherein the same conduct and resulting harm were touched upon in resulting agreements and orders.

### 2011 Agreement with New York State Department of Financial Services

87.     On September 1, 2011, Ocwen entered into an agreement on mortgage servicing practices with the New York State Department of Financial Services ("NYDFS") (hereinafter "the Agreement" or "Agreement").

88.     A true and accurate copy of the Agreement is attached hereto as ***Exhibit A.***

89.     On page 2, para. 6, Ocwen promised to ensure its account information is accurate and complete and to promptly remediate any inaccuracies, as well as annually conduct an independent review of its systems, policies, and procedures to ensure that they are sufficient to ensure accuracy and completeness.

90.     On page 3, para. 13, Ocwen promised to conduct regular audits of a statistically valid sample of documents from foreclosure and *bankruptcy* proceedings to ensure the documents being filed complied with the loan instruments, prevailing law and "these Servicing Practices[,]" its account information is accurate and complete and to promptly remediate any inaccuracies, as well as annually conduct an independent review of its systems, policies, and procedures to ensure that they are sufficient to ensure accuracy and completeness.

91.     On page 5, para. 17 Ocwen pledged to provide compliance training for all employees and managers including training on applicable state and federal laws regarding mortgage servicing and bankruptcy cases.

92.     On page 14, para. 44-46, Ocwen agreed to promptly accept and apply mortgage payments including payments made on cases in bankruptcy, including cure payments.

93.     By way of the Agreement, the Defendants had prior specific knowledge of the conduct complained of herein.

94.     Defendants have wholly failed to deliver on the promises made in the Agreement.

95.     The Agreement did not result in any material alteration to the relationship between AltiSource and Ocwen, the discontinuation of REALServicing, or any legal action to enforce standards inherent to the TPSAs.

**2012 Consent Decree With NYDFS**

96.     On June 13, 2012, NYDFS conducted a targeted examination of Ocwen to assess its compliance with the Agreement.

97.     On the 5th of December, 2012, Ocwen entered into a consent decree with NYDFS to resolve the concerns raised by the target examination ("2012 Consent Decree")

98.     A true and accurate copy of the 2012 Consent Decree is attached hereto as ***Exhibit B.***

99.     The 2012 Consent Decree required Ocwen to retain a compliance monitor who would report to NYDFS for a comprehensive review of Ocwen's servicing operations, including its compliance program and policies and procedures.

100.    Paragraph 2 and subparts of the 2012 Consent Decree set out the areas the compliance monitor would review.

101.    The 2012 Consent Decree also set out Ocwen's pledge to cooperate and set the length of the monitorship at twenty-four months.

102.    Ocwen ultimately retained the StoneTurn Group ("StoneTurn") as its Compliance Monitor with the consent of NYDFS. StoneTurn ultimately prepared Monitor Compliance Review Reports ("MCRs") setting out Ocwen's extensive failings with respect to the Agreement including those associated with REALServicing.

103.    By way of the 2012 Consent Decree, the Defendants possessed prior specific knowledge of the conduct complained of herein yet failed to correct the same.

104.    The 2012 Consent Decree did not result in any material alteration to the relationship between AltiSource and Ocwen, the termination of REALServicing, or any legal action by Ocwen to enforce standards inherent to the TSPAs.

### The 2014 National Mortgage Servicing Settlement and
### Settlement Agreement and Consent Order with 49 States

105.    In February of 2014, Ocwen entered into a Consent Order with the United States and 49 States regarding its mortgage servicing practices ("2014 National Consent Judgement").

106.    A true and accurate copy of the 2014 National Consent Judgement is attached hereto as ***Exhibit C.***

107.    Exhibit A to the 2014 National Consent Judgement contains what is commonly referred to as the National Mortgage Servicing Standards.

108.    Included within these standards is the requirement that Ocwen ensure that all factual assertions made in documents filed in bankruptcy courts were accurate, complete, and supported by competent and *reliable* evidence. *See* A-1, ¶ 1.

109.    Ocwen also agreed to promptly remediate any inaccuracies in borrower's account information and audit its account information periodically for accuracy. *See* A-7.

110.    With respect to Chapter 13 cases, the standards required Ocwen to ensure: "a. prompt and proper application of payments is made on account of (a) pre-petition arrearage amounts and (b) postpetition payment amounts and posting thereof as of the successful consummation of the effective confirmed plan; b. the debtor is treated as being current so long as the debtor is making payments in accordance with the terms of the then effective confirmed plan and any later effective payment change notices; and c. as of the date of dismissal of a debtor's bankruptcy case, entry of an order granting Servicer relief from the stay, or entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the debtor's obligations during the case and appropriately update the Servicer's systems of record. In connection with such reconciliation, Servicer shall reflect the waiver of any fee, expense or charge pursuant to paragraph III.B.1.c.i or III.B.1.d." *See* A-8.

111.    Also with respect to Chapter 13 cases, the standards state: " If the Servicer fails to provide information as required by paragraph III.B.1.a with respect to a fee, expense or charge within 180 days of the incurrence of such fee, expense, or charge, then, i. Except for independent charges ("Independent charge") paid by the Servicer that is either (A) specifically authorized by the borrower or (B) consists of amounts advanced by Servicer in respect of taxes, homeowners association fees, liens or insurance, such fee, expense or charge shall be deemed waived and may not be collected from the borrower." A-16.

112.    At page A-15, 16, Ocwen agreed to ensure that all employees regularly involved with bankruptcy files receive specific training on bankruptcy issues, to always file an Official Form B10 within 180 days after any fees, expenses or charges are incurred, and to timely respond to notices of final cure under Rule 3002.1.

113.    By way of the 2014 National Consent Judgment, the Defendants had prior

specific knowledge of the type of conduct complained of herein.

114.    The 2014 National Consent Judgment did not result in any material alteration to the relationship between AltiSource and Ocwen, the termination of REALServicing, or any legal action to enforce the standards inherent to the TSPAs.

## FACTUAL ALLEGATIONS PERTAINING TO WILLFULNESS AND DEFENDANTS' KNOWLEDGE OF THE HARM DETAILED HEREIN

115.    Independent of the regulatory actions described above, Ocwen has long utilized documents known as "Risk Convergence Reports/Spreadsheets" or "RCRs" to track its own "regulatory violations, risk areas, and other failures" including without limitation those associated with its relationship with AltiSource, its improper collection of fees and charges, and it's improper servicing of loans in bankruptcy generally.

116.    The CFPB described the RCRs as follows:

> Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on AltiSource [the vendor who licensed RealServicing to Ocwen], the status of any technology fix or other operational remediation, and other information.

> According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site  audit of AltiSource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that AltiSource was responsible for, little progress was being made to resolve the items due to AltiSource's "lack of priority."

> As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen

assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies.

117.    Based upon the CFPB's description of the RCRs, the highest levels of the Defendants' management were fully aware of their widespread and continued failure to comply with its legal obligations under the Bankruptcy Code, RESPA, and the FDCPA. The RCRs also demonstrate the Defendants allowed these problems to persist for years to their financial benefit.

118.    Based upon the CFPB's description of the RCRs, the Defendants have known for years they were routinely violating discharge injunctions, automatic stays, Fed. R. Bank. P. 3002.1, RESPA, and the FDCPA.

119.    Defendants knew these failings would cause Ocwen to misapply funds paid during and after the Chapter 13 case and seek to collect upon fees, costs, and expenses for which it had no legal right,  including without limitation negative escrow balances.

120.    Despite having this knowledge, Defendants did next to nothing to prevent or correct the harm caused to the Plaintiffs. Ocwen did not immediately cease utilizing REALServicing, AltiSource did not fix REALServicing, Ocwen did not notify impacted borrowers, Ocwen did not complete an audit or reconciliation to waive or refund all said fees, costs, and expenses.

121.    The Defendants did next to nothing because it was more profitable to maintain their scheme.

122.    Despite having this knowledge, Defendants continue to do next to nothing to correct the ongoing harm caused to borrowers and debtors like the Plaintiffs.

**<u>FACTUAL ALLEGATION SPECIFIC TO O'FLYNN</u>**

123.    O' Flynn filed his Chapter 13 bankruptcy case on November 6, 2012, in the United States Bankruptcy Court for the Southern District of Indiana (Case No. 12-13117-RLM-13) (the "Bankruptcy Case").

124.    Shortly after filing, O' Flynn proposed a Chapter 13 Plan [Filing No. 2] (the "Chapter 13 Plan"), amended by Order on October 7, 2013.

125.    Pursuant to the Amended Chapter 13 Plan, O' Flynn was to make regular monthly payments of $1,175.00 to the Chapter 13 Trustee, from which Ocwen would receive approximately $1,029.00 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage.

126.    Ocwen appeared in the Bankruptcy Case and participated in those proceedings by filing a Proof of Claim (Claim Filing No. 14 dated May 13, 2013) [Claim Filing No. 14-1] on behalf of Wilmington Trust, National Association, as Successor Trustee to Citibank, N.A. as Trustee for Bear Stearns Second Lien Trust 2007-SV1 Mortgage-Backed Certificates, Series 207-SVI.

127.    The Proof of Claim asserted a secured claim in the amount of $35,347.18 with an arrearage of $2,280.80 consisting of: (a) four payments due for a total of $2,252.08; (b) a late fees of $382.70; (c) BPO fees of $83.00 ; and (d) a credit for unapplied funds totaling  $-436.98.

128.    On December 13, 2017, the Chapter 13 Trustee filed a Notice of Final Cure Payment [Filing No. 84] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default ($2,280.00 in arrearage) had been paid in full and that O' Flynn had completed all ongoing payments to Ocwen required under the plan ($33,781.20). In total, Ocwen received $36,062.00 from the Trustee.

129.    On December 20, 2017, Ocwen filed a Response to Notice of Final Cure Payment [Filing No. doc] under Claim Number 14 on the Claims Register "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim."

130.    Per the Response to Notice of Final Cure Payment, O' Flynn was to make his next post-petition payment on December 1, 2017.

131.    Beginning on December 1, 2017, O' Flynn commenced making timely and adequate monthly installment payments on the Loan.

132.    On February 2, 2018, O' Flynn obtained an Order of Discharge.

133.    Per the Chapter 13 Plan, the Order of Discharge, and in light of the Response to Notice of Final Cure Payment, O' Flynn's mortgage was to be reinstated according to the original terms and any right of Ocwen, as mortgage servicer and agent of the owner of the mortgage loan account, to recover any amounts alleged to have arisen prior to his bankruptcy was thereby extinguished.

134.    Despite the foregoing, O' Flynn exited bankruptcy with his loan in a manufactured state of default, with a negative escrow balance, and an assortment of fees and costs for which no notice was provided previously in violation of F.R.B.P. 3002.1.

135.    Following O' Flynn's exit from bankruptcy, the Defendants began aggressive efforts to collect upon the foregoing amounts including without limitation sending dunning letters, making automated collection calls, and reporting the loan as delinquent to credit reporting agencies.

136.    Each of the collection efforts described above contained knowing material misrepresentations about the loan's balance, status, and the Defendants' ability to collect upon the fees, charges, and costs sought therein.

137.    O' Flynn made numerous attempts to notify the Defendants of the foregoing and have the items corrected to no avail.

138.    O' Flynn relied upon the Defendants' representations in paying fees, costs, and charges he otherwise would not have.

139.    The Defendants knew, even without O' Flynn's communications, that the alleged state of default, negative escrow balance, and accumulation of fees, charges, and costs were discharged or otherwise uncollectible.

140.    The Defendants knew the alleged state of default, negative escrow balance, accumulation of fees, charges, and costs were the natural byproduct of their continued use of REALServicing, an absence of compliance safeguards, and breach of the commitments made in the regulatory actions set forth above.

141.    The Defendants have never refunded any amounts to O' Flynn.

**FACTUAL ALLEGATION SPECIFIC TO WILHOLD**

142.    Wilhold filed for Chapter 13 bankruptcy on May 22, 2014, in the United States Bankruptcy Court for the Southern District of Illinois (Case No. 14-30858) (the "Bankruptcy Case").

143.    Shortly after filing, Wilhold proposed a Chapter 13 Plan [Filing No. 2] (the "Chapter 13 Plan"), amended by Order on May 18, 2018.

144.    Pursuant to the Amended Chapter 13 Plan, Wilhold was to make regular monthly payments to the Chapter 13 Trustee of which $1,091.43 from July 1, 2014 to October 1, 2016, $1,112.06 from November 1, 2016 to September 1, 2017, and $1,113.13 from October 1, 2017 to the end of the plan would be forward to Ocwen.

145.    Initially, Ocwen failed to file a Proof of Claim.

146.    Therefore, Wihold's bankruptcy attorney filed one on its behalf (Claim Filing No. 6 dated February 2, 2015) [Claim Filing No. 6-1] under penalty of perjury asserting a secured claim with an arrearage amount of $14,905.67 consisting of: (a) thirteen payments due for a total of $14,398.54 and total prepetition fees, expenses, and charges of $507.13.

147.    On December 19, 2017, almost three years after Wilhold filed for bankruptcy, Ocwen filed a Proof of Claim [Claim Filing No. 6-2] asserting a secured claim with an "amount necessary to cure any default as of the date of the petition" of $13,700.90.

148.    Wilhold make all payments required of the Chapter 13 Plan.

149.    On July 11, 2019, the Chapter 13 Trustee filed a Notice of Final Cure Payment [Filing No. 77] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default ($13,700.90) had been paid in full and that Wilhold had completed all ongoing payments to Ocwen required under the Chapter 13 Plan.

150.    On July 30, 2019, Ocwen filed a Response to Notice of Final Cure Payment [Filing No. doc] under Claim Number 6 on the Claims Register "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim" the debtor(s) are current with all postpetition payments consistent with § 1322(b)(5) of the Bankruptcy Code, including all fees, charges, expenses, escrow, and costs."

151.    Per the Response to Notice of Final Cure Payment, Wilhold was to make his next post-petition payment on August 1, 2019.

152.    Beginning in August of 2019, Wilhold commenced making timely and adequate monthly installment payments on the Loan.

153.    On August 14, 2019, Wilhold obtained an Order of Discharge.

154.     Per the Chapter 13 Plan, the Order of Discharge, and in light of the Response to Notice of Final Cure Payment, Wilhold's mortgage was to be reinstated according to the original terms and any right of Ocwen, as mortgage servicer and agent of the owner of the mortgage loan account, to recover any amounts alleged to have arisen prior to his bankruptcy was thereby extinguished.

155.     Despite the foregoing, Wilhold exited bankruptcy with a negative escrow balance of approximately -$3,963.50 and fees and costs not reflected in the Proof of Claim above nor for which any notice was provided as required by F.R.B.P. 3002.1.

156.     Following Wilhold's exit from bankruptcy, the Defendants began efforts to collect upon the foregoing amounts and dramatically increased his monthly payment obligation.

157.     Each of the collection efforts described above contained knowing material misrepresentations about the loan's balance, status, and the Defendants' ability to collect the amounts sought.

158.     Wilhold made numerous attempts to obtain information about why he exited bankruptcy only to have his monthly payment obligation dramatically increase, notified Ocwen of his concerns about how this was affecting him, but to no avail.

159.     At some point, the Defendants changed Wilhold's account number.

160.     Wilhold relied upon the Defendants' representations in paying fees, costs, and charges he otherwise would not have.  Wilhold had no choice but to pay the increased monthly payments for if he did not he would face certain default and the accumulation of additional fees and costs.

161.     The Defendants knew, even without Wilhold's communications, that the negative escrow balance, and fees, charges, or costs were discharged or otherwise uncollectible.

162.    The Defendants knew the alleged escrow deficiency, accumulation of fees, charges, and costs were the natural byproduct of their scheme, continued use of REALServicing, failure to perform requisite escrow analyses, failure to adhere to the requirements of F.R.B.P 3002.1, and breach of some of various commitments made in the regulatory actions set forth above.

163.    The Defendants have never refunded any amounts to Wilhold and continue to collect upon an alleged escrow deficiency.

## FACTUAL ALLEGATIONS SPECIFIC TO THE ADDISONS

164.    On August 21, 2014, the Addisons filed a bankruptcy case pursuant to Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 14-07857-RLM-13.

165.    Shortly after filing, the Addisons proposed a Chapter 13 Plan which was amended on October 1, 2014 (the "Amended Chapter 13 Plan") [Filing No. 26].

166.    On January 13, 2015, the bankruptcy court entered an Order Confirming [Amended] Chapter 13 Plan [Filing No. 46] which was corrected on February 6, 2015 [Filing No. 48].

167.    Pursuant to the confirmed Amended Chapter 13 Plan, the Addisons were to make regular monthly payments of $2,440.00 to the Chapter 13 Trustee, from which Ocwen, who is now PHH, would receive approximately $750.22 per month, and from which HSBC would receive approximately $956.24 per month.

168.    Ocwen appeared in the bankruptcy case and participated via the filing of a Proof of Claim (Claim Filing No. 15 dated September 4, 2015) which was amended on October 22, 2015. [Claim Filing No. 15-2].

169.    The Proof of Claim asserted a secured claim in the amount of $70,629.00.

170.    Upon information and belief, the Proof of Claim was inaccurate.

171.    On April 4, 2019, Ocwen filed a Transfer Of Claim Other Than For Security pursuant to Fed. R. Bankr. P. 3001(e)(2), transferring its claim to PHH. [Filing No. 117].

172.    Pursuant to the Transfer Of Claim Other Than For Security, payments and notices were to be thereafter directed to PHH.

173.    On April 11, 2019, the Chapter 13 Trustee filed a Notice of Final Cure Payment [Filing No. 119] pursuant to FRBP § 3002.1(f), stating the amount necessary to cure the HSBC claim had been paid in full and that the Addisons had completed all other ongoing payments required under the Chapter 13 Plan.

174.    On May 1, 2019, Defendants filed a Response to Notice of Final Cure Payment [Filing No. doc] under Claim Number 7 on the Claims Register, "agree[ing] that the debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim" and "that the debtor(s) are current with all postpetition payments consistent with § 1322(b)(5) of the Bankruptcy Code, including all fees, charges, expenses, escrow, and costs.

175.    On June 8, 2019, an Order of Discharge was entered. [Filing No. 125].

176.    In accordance with the Chapter 13 Plan, Order of Discharge, Notice of Final Cure Payment, and Response to Notice of Final Cure Payment, the Loan was to be reinstated according to the original terms and any right of HSBC or Wilmington Savings Fund Society, FSB to recover any amounts alleged to have arisen prior to filing but not included in the Proof of Claim or subsequent notice was thereby extinguished.

177.    Thereafter, the Addisons continued making timely and adequate monthly installment.

178.    Following Addisons' exit from bankruptcy, the Defendants began aggressive efforts to collect upon the foregoing amounts including without limitation sending dunning letters, making automated collection calls, and reporting the loan as delinquent to credit reporting agencies.

179.    Each of the collection efforts described above contained knowing material misrepresentations about the loan's balance, status, and the Defendants' ability to collect upon the fees, charges, and costs sought therein.

180.    The Addisons made numerous attempts to seek information from the Defendants, notify them of their bankruptcy, question the status of their loan, but to no avail.

181.    The Addisons relied upon the Defendants' misrepresentations in paying fees, costs, and charges they should not have.

182.    The Defendants knew, even without the Addisons' communications, that the principal balance was incorrect, or likely to be incorrect, and that those amounts were discharged or otherwise uncollectible.

183.    The Defendants knew the increased principal balance, accumulation of fees, charges, and costs were the natural byproduct of their continued use of REALServicing, an absence of compliance safeguards, and breach of the commitments made in the regulatory actions set forth above.

184.    The Defendants have never refunded any amounts to the Addisons.

**FACTUAL ALLEGATIONS WITH RESPECT TO THE STATUTE OF LIMITATIONS**

185.    Any applicable statutes of limitations have been tolled by the Defendants' knowing and active fraudulent concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and

members of the Class could not reasonably have discovered the true nature of the Defendants scheme and enterprise.

186.    Defendants efforts to fraudulently conceal their scheme and enterprise include without limitation: a) refusing to provide sufficient supporting documentation or honest explanation for the amounts they sought or seek to collect in response to borrower inquiries; b) misrepresenting to Plaintiffs the issues herein were caused by failures by the U.S. Trustee or bankruptcy counsel;  c) failing to notify affected borrowers and debtors; d) modifying the loans of affected borrowers and debtors in such a way as to "cure" the problems by rolling the sought after amounts into their principal balance; e) providing payoff statements to borrowers and debtors reflecting amounts "owed" known to be inaccurate and a product of the deficiencies at issue herein; f)    misrepresenting to borrowers and debtors that their loans had undergone a bankruptcy reconciliation and/or were audited at the time they were transferred to BlackKnight MSP; d) using suspense accounts that are not detailed in all borrower correspondence to track amounts to later be collected; e) failing to provide notices required by Fed. R. Bank. P. 3002.1 and RESPA; f) decommissioning REALServicing is such a way to deprive borrowers of life of loan data in native format and with date of last change information; and, g) ceasing to utilize the Ocwen name in favor of PHH without notifying borrowers their loan really wasn't "changing hands".

187.    Ocwen was under a continuous duty to disclose to Plaintiffs and members of the Class, and the bankruptcy court, the true character and nature of all service fees they assess on borrower accounts or amounts they sought to collect. These disclosures include requisite bankruptcy filings, monthly billing statements, payoff statements, and direct communications with borrowers. Plaintiffs and members of the Class reasonably relied upon the Defendants'

representations, disclosures, and assurances. Based upon the foregoing, the Defendants should be estopped from relying on any statutes of limitations as a defense in this action.

188.    The causes of action alleged herein will only accrue upon discovery of the true nature of the unlawful amounts collected or sought to be collected, as a result of the Defendants' continuing fraudulent concealment of material facts.

189.    Legal scholars have explained that, as a result of deceptive practices like those utilized by the Defendants, it is impossible for borrowers to determine they are victims of mortgage service abuses because "without a true itemization that identifies the nature of each fee, [payment application, or escrow transaction,] parties cannot verify that a mortgage claim is correctly calculated...the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract...By obscuring the information needed to determine the alleged basis for the [additional amounts sought] servicers thwart effect review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made." Katherine M. Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 TEX. L. REV. 121, 155 (2008).

190.    Additionally, judges examining similar conduct have found that, "[a]t the heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the trustee, or Court, the nature or amount of fees and charges assessed . . . . Lack of disclosure facilitates the injury. Naive borrowers/debtors, trustees, and creditors rightly assume that [the loan servicer] is complying with the plain meaning of its notes, mortgages, court orders, and confirmed plans. Why would anyone assume otherwise? . . . How are they to challenge a practice or demand correction of an error they do not know exists [or cannot specifically detail]?" *See In re Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

## CAUSES OF ACTION
### Count I: Violation of R.I.C.O. (18 U.S.C. §1962(c))

191.    Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations.

192.    Plaintiffs bring this cause of action on behalf of themselves and members of the Chapter 13 Class.

193.    Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3).

194.    Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Enterprise set forth below through a pattern of racketeering activity.

195.    Plaintiffs are "person[s] injured in his or her business or property" by reason of Defendant's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

196.    Plaintiffs were the intended targets of Defendants' racketeering activities.

### The Enterprise

197.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Enterprise:

a. Defendants, who have taken the steps set forth above relating to the servicing of loans and the failure to abide by orders of Bankruptcy judges and failing to comply with the requirement of the Bankruptcy Code;

b. Defendants' officers, executives, and other employees, who have collaborated and colluded with each other and with other associates in fact in the Enterprise to seek to obtain from Plaintiffs and Class members payments in excess of those owed pursuant to Notice of Final Cure payments or similar court rulings received by borrowers whose loans Defendant serviced, as well as the other acts set forth herein relating to seeking to obtain debt payments in excess of those lawfully due and in falsely reporting Chapter 13 debtors' loan balances and delinquencies to credit reporting agencies;

198.    The Enterprise, which engaged in, and whose activities affected interstate commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

199.    While the Defendants participated in the conduct of the Enterprise, they had an existence separate and distinct from the Enterprise as a whole. For instance, Ocwen serviced many loans for borrowers who never entered into bankruptcy, who never paid unlawful amounts (likely because they were never so much as late), and who never received any collection communications. Similarly, AltiSource profited from many loans which never went into bankruptcy and has provided some ancillary services for mortgage servicers other than Ocwen. Further, the Enterprise was separate and distinct from the pattern of racketeering in which the Defendants have engaged.

200.    At all relevant times, Ocwen controlled or managed the Enterprise according to policies and procedures developed by its executives and shareholders, and uses the other members as instrumentalities to carry out its fraudulent scheme.

201.    These policies and procedures include without limitation: funneling default-related ancillary services through AltiSource to disguise unlawful mark-ups by third parties and whether or not the resulting charges could be applied to the loan per its terms; not tracking or confirming that said ancillary services were actually provided; adhering to the terms of a technology agreements negotiated by conflicted parties; continuing to utilize REALServicing; transferring loan data from REALServicing to BlackKnight MSP without audit to ensure the unlawful and inflated fees remained on the loan; and using this loan data to attempt to collect on the amounts at issue.

202.    Defendants also intentionally failed to implement policies and procedures in

furtherance of the Enterprise, including without limitation: adopting an appropriate methodology for auditing loans; ensuring the accuracy of borrower communications; ensuring the proper management of borrower escrow accounts; ensuring all fees and costs assessed to borrow loans were at market rate; and ensuring that fees for services performed during Plaintiffs' bankruptcies were identified as fees that were discharged by those bankruptcies.

203.    Ocwen's participation in the Enterprise was necessary for the successful operation of its scheme to defraud because, as servicer, it controlled communications with the Plaintiffs and Class Members about their outstanding balances and their modification options.

204.    The members of the Enterprise all served a common purpose: to profit from unlawful fees and costs to mortgage loans, circumvent the protections otherwise afforded by bankruptcy, and to benefit from inflated principal balances and longer streams of payments, all of which was directed at and to the detriment of Plaintiffs. To achieve the common purpose, participants in the Enterprise preserve close business and personal relationships and maintain established and defined roles within the Enterprise.

205.    The relationship between the Defendants has been in existence for many years, is still ongoing, and has longevity sufficient to permit participants to achieve their common purposes.

206.    AltiSource participates in the enterprise and conduct of its affairs by continuing to receive payments (or improvements in the value of their common shares) when Ocwen successfully induces borrowers to pay amounts they do not owe because of their bankruptcy or do not owe (irrespective of the bankruptcy) because the fees and costs should not have been assessed in the first place.

207.    Given the arrangements between Ocwen and AltiSource, and their common

shareholders, the entities have aligned incentives to work towards their common

purpose of collecting more ancillary service fees, circumventing protections afforded by

bankruptcy proceedings, and increasing the principal balance owed by borrowers. Ocwen is paid

servicing fees based in part on outstanding principal balances, and the SPVs (and the investors in

the securities they issue) benefit from the higher and longer stream of payments associated with

loans that have higher outstanding principal balances.

208.   By developing and implementing policies and procedures leading to the repeated,

and unlawful charging of fees and costs, Defendant has used its role in the  Enterprise to

enrich itself unlawfully at the expense of former Chapter 13 debtors, and engaged in the conduct

of the Enterprise distinct from own affairs as a loan servicer and contrary to the servicing

guidelines under which it is obligated to operate.

### The Predicate Acts

209.   Defendant's systematic scheme to defraud successful Chapter 13 borrowers who

have mortgage loans serviced by Ocwen was facilitated by the use of the United States mail and

wire. Ocwen's activities constitute "racketeering activity" within the meaning of 18 U.S.C. §

1961(1)(A) as acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 and within the

meaning of 18 U.S.C. § 1961(1)(D) as an offense involving fraud connected with a case under

title 11.

210.   In violation of 18 U.S.C. §§ 1341 and 1343, Ocwen utilized the mail and wire in

furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen by

obtaining money from borrowers using false or fraudulent pretenses.

211.   Through the mail, including the communications set forth in paragraphs 63-65,

70, above, to the Plaintiffs, Defendant provided mortgage invoices, loan statements, and payoff

statements, that misrepresented the status of the mortgage loan and did not accurately account for

the Chapter 13 bankruptcy proceedings. Defendant also accepted payments and engaged in other

correspondence in furtherance of their scheme through the mail. Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341 and fraud connected with a case under title 11.

212.    Through the wire and the mail Ocwen provided mortgage invoices, bankruptcy filings, loan statements, payoff statements, and offers for loan modifications that misrepresented the status of the mortgage, concealed the application of unlawful and inflated fees, and did not accurately account for the Chapter 13 bankruptcy proceedings. Ocwen also accepted payments and engaged in other correspondence in furtherance of their scheme through the wire. Each of these acts constituted an act of mail and wire fraud for purposes of 18 U.S.C. § 1343 and fraud connected with a case under title 11.

213.    Ocwen knowingly and intentionally committed these instances of fraud in furtherance of its scheme to defraud borrowers who were participants in Chapter 13 bankruptcy proceedings.

214.    Further, to lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful actions, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such amounts were accurate, in accordance with the terms of their mortgage, and appropriate. Alternatively, Ocwen has concealed this scheme by modifying loans to roll unlawful amounts into borrower's principle balances, failing to file requisite bankruptcy notices, ceasing to utilize the Ocwen name on borrower communications,  changing borrower account numbers to make it more difficult for them to obtain information, and failing to provide borrowers with full life of loan histories in native formation or complete itemizations of all amounts beyond principal, interest, and escrow.

215.    The mortgage invoices, loan statements, bankruptcy filings, payoff statements, and offers of loan modification were material to Plaintiffs and members of the Class. Had the Enterprise disclosed the true nature or amount of the additional amounts, known "deficiencies" of REALServicing, Plaintiffs and members of the Class would have been aware of the unlawful

41

amounts, the fact they were not legally obligated to pay additional amounts associated with their scheme, and could have taken sooner and more targeted action to address the same.

216.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which Ocwen has engaged under 18 U.S.C. §1962(c).

217.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity. As stated above, Ocwen continues to maintain its relationship with AltiSource and continues to collect upon unlawful amounts following the transfer loans to BlackKnight MSP.

218.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c), Plaintiffs and members of the Class have suffered, and continue to suffer, substantial damage.

219.    Defendant is liable to Plaintiffs and members of the Class for treble damages and appropriate injunctive relief together with all costs of this action, plus reasonable attorney's fees, as provide under 18 U.S.C. § 1964(c)

## COUNT II: Violation of R.I.C.O, Conspiracy to Violate 18 U.S.C. 1962(d)

220.    Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

221.    Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to maintain an interest or control of a racketeering enterprise and by agreeing that someone would commit at least two predicate acts as part of the Enterprise.

222.    Defendants' agreement to control the Enterprise is manifested by their mutual continued use of REALServicing, maintenance of their relationship despite various regulatory actions and borrower initiated litigation, the absence of a material modification to the TSPAs or

Binding Term Sheet, exclusion of other entities, and the absence of any formal litigation or dispute resolution process between them.

223.    Defendants knew and agreed that Ocwen would be communicating with Plaintiffs through both the mails and the wires in furtherance of the Enterprise.

224.    These communications constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

225.    AltiSource acted in furtherance of the Enterprise by ordering, coordinating, submitting invoices for ancillary services and leasing REALServicing to Ocwen.

226.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(d), Plaintiffs and members of the Class have suffered, and continue to suffer, substantial damage.

227.    Defendants are liable to Plaintiffs and members of the Class for treble damages and appropriate injunctive relief together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

**Count III: Violation of the FDCPA, 15 U.S.C §1692k**

228.    Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

229.    Plaintiffs bring this cause of action on behalf of themselves and the members of the Chapter 13 Class.

230.    Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

231.    The FDCPA applies to debt collectors, not original creditors. Ocwen is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as it obtained servicing rights to the loans at issue

and began servicing them after an incident of default.

232. Plaintiffs are "consumer[s]" as defined by 15 U.S.C. § 1692a(3), and their loans are debts as defined by 15 U.S.C. § 1692A(4) as Ocwen acquired servicing rights after an incident of default or bankruptcy.

233. Ocwen regularly collects, or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due, to a third party.

234. Ocwen violated 15 U.S.C. §1692(e) when it repeatedly misrepresented the character, amount, or legal status of the loans. Ocwen misrepresented to Plaintiffs they were delinquent, obligated to pay amounts they did not in fact owe, or obligated to immediately begin making increased monthly payments to cure their alleged escrow deficiency balance.

235. Ocwen violated 15 U.S.C. §1692(e)(10) when it used false representations, through false loan statements that the loans were delinquent or had unpaid fees or unpaid escrow deficiencies so to collect on the same despite knowing said amounts were not collectible.

236. Ocwen violated 15 U.S.C. §1692f(1) by attempting to collect, and actually collecting, amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not permitted by law by (i) misrepresenting the status of the Plaintiffs' debts; (ii) attempting to collect fees and costs for which notice was not provided in accordance with Fed. R. Bank. P. 3002.1; (iii) misrepresenting amounts owed for escrow; (iv) declaring the loans were delinquent; and (v) reporting the same to the credit bureaus.

237. Ocwen violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable

means to collect upon the subject debt including but not limited to concealing its involvement via the use of the PHH name, making material misrepresentations that Plaintiff's loans were audited or reconciled after bankruptcy or when transferred from REALServicing to BlackKnight MSP, and failing to disclose to Plaintiffs their loans likely included uncollectible amounts due to identified "deficiencies" with REALServicing.

238.    As a result of Ocwen's violation of the FDCPA, Plaintiffs are entitled to an award of actual damages, statutory damages not to exceed the lesser of $500,000.00 or one percent of Ocwen's net worth, costs of this action and reasonable attorney's fees.

## Count IV: Violation of the RESPA

239.    Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations of this Complaint.

240.    Plaintiffs bring this cause of action against Ocwen under the RESPA, 12 U.S.C. §§ 2605 and the regulations promulgated thereunder at Regulation X, 12 C.F.R. § 1024 et seq.

241.    Plaintiffs bring this cause of action on behalf of themselves and all members of the Chapter 13 Class.

242.    Ocwen is a "servicer" as defined by 12 U.S.C. § 2605(i).

243.    Section 17 of Regulation X required Ocwen to conduct annual escrow analyses for borrowers, 12 C.F.R. § 1024.17(c)(3) and (f)(1).

244.    Similarly, 12 U.S.C. §§ 2609(b)(2) requires a servicer to notify a borrower not less than annually of any shortage of funds in their escrow account.

245.    Ocwen has failed to conduct timely escrow analyses, or provide timely notices of

any shortage funds, for thousands of borrowers who filed for bankruptcy including Plaintiffs. This failure stems from its continued use of REALServicing, which in turn stems from its ongoing scheme with AltiSource.

246.    An escrow analysis enables all participants to a Chapter 13 bankruptcy proceeding to ensure a Chapter 13 plan accounts for changes to a borrower's tax and insurance obligations and in turn that the borrower exits bankruptcy current in all respects.

247.    As a result of Ocwen's failure to conduct escrow analyses, borrowers such as Plaintiffs have experienced an escrow deficiency despite making all of their mortgage payments pursuant to a court-approved plan under Chapter 13 of the U.S. Bankruptcy Code.

248.    Ocwen's failure to perform the required escrow analyses, or timely notice of any alleged shortage of funds in escrow, caused borrowers like the Plaintiffs to experience large payment shocks resulting from Ocwen dramatically increasing their monthly payment obligations.

249.    Ocwen's failure to conduct timely annual escrow analyses violated 12 C.F.R. § 1024.17(c)(3) and (f)(1).

250.    Where a servicer, such as Ocwen, fails to comply with its duties as described by 12 U.S.C. § 2609(b) its claim for any escrow monies it failed to disclosure are appropriately waived. *See* C*hase Manhattan Mortg. Corp. v. Padgett*, 268 B.R. 309 (S.D. Fla. 2001); *Craig-Likely v. Wells Fargo Home Mortg. (In re Craig-Likely)*, No. 06-13665, 2007 U.S. Dist. LEXIS 29042 (E.D. Mich. Mar. 2, 2007).

251.     The foregoing conduct constitutes a "pattern and practice" of noncompliance.

The allegations and conduct at issue are, or were, also at issue in the regulatory actions detailed

above and in *Demona Freeman v. Ocwen Loan Servicing, LLC,* Cause Nos.

1:18-cv-03844-TWP-DLP and 12-104713-JJG-13 *(pending); Roger Todd v. Ocwen Loan*

*Servicing, LLC.,* Cause No. 2:19-cv-00085-JMS-DLP; and *Roderick Converse v. Ocwen Loan*

*Servicing, LLC.*, Cause No. 1:19-CV-04872-SEB-MPB.

## COUNT V: Motion for Contempt and Sanctions

252.     Plaintiffs incorporate by reference and restate as though fully set forth herein all

previous allegations of this Complaint.

253.     Plaintiffs bring this request for relief on behalf of themselves and members of the

Chapter 13 Class.

<u>Violation of Discharge Injunction Provided by 11 U.S.C. § 524(i)</u>

254.     Defendants participated in the underlying bankruptcy proceedings, filed proof of

claims, received payments during the duration of bankruptcy proceedings, and therefore received

actual notice of each Order of Discharge.

255.     Defendants have collected, or now seek to collect upon, sums from the Plaintiffs

that either should never have been assessed to their loans, result from payment misapplications,

were discharged pursuant to the Court's entry of the discharge injunction in their respective

bankruptcy cases.

256.     The Defendants' conduct constitutes a gross violation of the discharge injunction

as they knowingly: (1) have and continue to routinely treat borrowers who successfully complete

a Chapter 13 bankruptcy proceeding as still being delinquent or still owing fees, costs, and charges;

47

(2) have and continue to routinely fail to perform escrow-account analyses on loans or provide borrowers of requisite notice of any alleged escrow shortage; (3) have and continue to missapply payments resulting in unlawful fees and increased principal balances; (4) have and continue to utilize all manner of correspondence in an effort to collect upon the amounts above.

257. The Defendants have and continue to derive a material financial benefit from their acts and omissions by circumventing the protections afforded to debtors like the Plaintiffs via bankruptcy proceedings.

258. Ocwen's actions were willful, knowing, reckless, or intentional and caused Plaintiffs concrete injury as set forth above, rendering Ocwen liable for punitive damages. *See, e.g.*, *Romanucci & Blandin, LLC. v. Lempesis*, 2017 WL 4402643, at *6-7 (N.D. Ill. May 4, 2017); *see also* 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statute governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6").

259. The allegations raised herein against the Defendants are also at issue in another matter pending before this Court: *Demona Freeman v. Ocwen Loan Servicing, LLC,* Cause No. 12-104713-JJG-13.

### Violation of Fed. R. Bankr. P. 3002.1

260. Defendants are required to comply with Fed. R. Bankr. P. 3002.1 during the pendency of all Chapter 13 bankruptcy proceedings.

261. Among the requirements placed upon the Defendant by Fed. R. Bankr. P. 3002.1 is that it serve notice upon the Debtors, the Debtors' counsel, and the Trustee of any and all fees, expenses, or charges that were incurred in connection with the claim after the bankruptcy case

was filed and which it claims are recoverable against the Debtors or their residence. This notice must be provided within 180 days of the date such fees, charges, or expenses are incurred. Fed. R. Bankr. P. 3002.1(c).

262.    At various times during the pendency of the Plaintiffs' Chapter 13 bankruptcy proceedings Defendant failed to provide notice under Fed. R. Bankr. P. 3002.1 of its intention to levy and collect post-petition charges, fees, or expenses incurred in connection with its claim.

<u>Violations of 11 U.S.C. § 362(a)</u>

263.    At all times relevant hereto, Defendants were subject to the Automatic Stay as set forth in 11 U.S.C. §362(a).

264.    The actions of the Defendants as described herein were intentional and undertaken with full knowledge of the Plaintiffs' Chapter 13 bankruptcy proceedings and the Defendants' inclusion as a creditor.

265.    The Defendants violated the provisions of 11 U.S.C. § 362(a).

266.    The Defendant's violations of the Automatic Stay were "willful". *See Moncada v. Ga. Heritage Bank (In re Moncada)*, No. 16-21407-JRS, 2016 Bankr. LEXIS 4221 (Bankr. N.D. Ga. Dec. 9, 2016); *see also Mitchell Constr. Co. v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr. N.D. Ga. 1995); *In re Roche*, 361 B.R. 615 (Bankr. N.D. Ga 2006).

**COUNT VI: Unjust Enrichment**

267.    Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

268.    Plaintiffs bring this cause of action on behalf of themselves and members of the Unjust Enrichment Subclass

269.    By way of their wrongful acts and omission of material facts, the Defendants have

been unjustly enriched at the expense of the Plaintiffs and members of the Class.

270.    Defendants have collected fees, costs, and charges from Plaintiffs that were uncollectible, in violation of the underlying mortgages, or a product of their common scheme.

271.    Plaintiffs have rendered a measurable benefit to Defendants at the Defendants' express request by paying some or all of the unlawful amounts at issue.

272.    Plaintiffs received no benefit from these payments because they had no legal obligation to make them, nor did they receive any product or service in exchange.

273.    Thus, Plaintiffs have been unjustly deprived.

274.    It would be inequitable and unconscionable for the Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct as alleged herein.

## JURY DEMAND

Plaintiffs, by and through undersigned counsel, hereby respectfully demand a trial by jury on all such claims that may be so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, having set forth her claim for relief and the facts supporting this claim, respectfully prays of this Honorable Court as follows:

A.    That this Court adjudge Ocwen to be in Contempt of this Court's discharge injunction;

B.    That this Court certify the Class, certify the Plaintiffs as representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

C.    That this Court order Ocwen to bear financial responsibility for notifying all members of the Class of the alleged conduct at issue herein and for the completion of any necessary loan audits;

50

D.      That Plaintiffs and members of the Class be awarded actual damages in an amount according to proof at trial;

E.      That Plaintiffs and members of the Class be awarded statutory damages not to exceed the lesser of $500,000 or one percent of Defendants' net worth for its violations of the FDCPA;

F.      That Plaintiffs and members of the Class each be awarded statutory damages not exceed Two Thousand Dollars ($2,000) for Defendants' "pattern and practice" of servicing noncompliance in violation of the RESPA;

G.      That Plaintiffs and members of the Class be awarded treble [actual] damages for Defendants violations of R.I.C.O;

H.      That Plaintiffs and members of the Class have and recover from Defendants a sum to be determined by the Court in the form of sanctions and punitive damages in such an amount that will impress upon them the seriousness of its wrongdoing and coerce a change in behavior;

I.      That Ocwen and AltiSource be held jointly and severally liable for any damages or relief awarded herein;

J.      That Ocwen be enjoined from using AltiSource as an ancillary services provider;

K.      Where applicable, an award of interest on the monies wrongfully obtained from the date of collection through the date of entry of judgement in this action;

L.      An award of attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

M.      For such other and further relief as the Court may deem just and proper.

*Respectfully submitted,*

*/s/ Brad A. Catlin*
Ronald J. Waicukauski, Atty. No. 1089-53
Brad Aaron Catlin, Atty. No. 21570-29
WILLIAMS & PIATT, LLC
301 Massachusetts Ave., 2nd Floor
Indianapolis, IN 46204
Tel: (317) 633-5270
ron@williamspiatt.com
brad@williamspiatt.com


/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
William W. Gooden, No. 19358-49
Oliva A. Hess, No. 36166-49
CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
wgooden@clarkquinnlaw.com
ohess@clarkquinnlaw.com