**September 28, 2023**



**Robyn L. Moberly**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID ROBERT O'FLYNN | ) | CASE NO. 12-13117-RLM-13 |
| PAMELA SUE O'FLYNN | ) | |
| | ) | |
| Debtors | ) | |
| ——————————————— | ) | |
| | ) | |
| DAVID ROBERT O'FLYNN, et. al | ) | ADV. PRO. 21-50079 |
| *On behalf of themselves and others* | ) | |
| *Similarly situated* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| PHH MORTGAGE CORPORATION, | ) | |
| OCWEN FINANCIAL | ) | |
| CORPORATION, and ALTISOURCE | ) | |
| SOLUTIONS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| ——————————————— | ) | |

### BANKRUPTCY COURT'S PARTIAL DISMISSAL and REPORT and RECOMMENDATION REGARDING DEFENDANTS' MOTIONS TO DISMISS

### I. Background

Defendant Ocwen Financial Corporation ("Ocwen") is a financial services company servicing consumer mortgage loan accounts, focusing on subprime loans. Defendant PHH Mortgage Corporation ("PHH") is a wholly owned subsidiary of

1

Ocwen. In 2018, Ocwen merged its mortgage servicing operations into PHH and its mortgage servicing operations were thereafter performed under the PHH name. In 2009, a portion of the Ocwen business was spun off to create Defendant AltiSource Portfolio Services (designated in this matter as defendant "AltiSource Solutions, Inc." or "AltiSource"), which provided a suite of services for mortgage loans in default.

Four named Plaintiffs, David R. O'Flynn (O'Flynn), Kenneth Novak (Novak), Donald L. Wilhold (Wilhold) and James Addison (Addison), have brought their Amended Complaint[1] to redress injuries they allege to have suffered during and after their respective bankruptcy cases. In their eight (8) count Amended Complaint, Plaintiffs allege that Ocwen/PHH Mortgage and AltiSource, through a fraudulent scheme, overcharged for services performed during their bankruptcy cases, intentionally failed to comply with federal law governing the actions of loan servicers, violated the bankruptcy discharge injunction, gave false information to credit reporting agencies, and collected unearned fees. Further, Plaintiffs allege together the Defendants constitute an Enterprise and their actions constitute violations of the RICO statute. The Plaintiffs' Amended Complaint also alleges violations of (1) The Fair Debt Collection Practices Act (FDCPA); (2) The Real Estate Settlement Procedures Act (RESPA); (3) the Indiana Deceptive Consumer Sales Act (IDCSA); (4) the Indiana Home Loan Practices Act (IHLPA) ; (5) the discharge injunction (11 U.S.C. §524) and Rule 3002.1 of the Federal Rules of Bankruptcy Procedure as well as (6) recovery under the theory of unjust enrichment. The Plaintiffs have limited their claims against AltiSource to Counts I and II (RICO and RICO conspiracy) and Count VIII (Unjust Enrichment).

## II. Procedural History

Suit was filed in this Bankruptcy Court for the Southern District of Indiana on August 31, 2021 on behalf of the four named Plaintiffs. On November 22, 2021

---

[1] On August 31, 2021, a Complaint was filed. Thereafter the Amended Complaint was filed as Dkt. 86 on August 23, 2022 .

AltiSource filed a Motion to Dismiss [2] all counts of the Complaint, along with a brief in support.  Ocwen and PHH also filed their joint Motion to Dismiss and brief on November 22, 2021.[3]  After consultation with counsel, the Bankruptcy Court filed a Recommendation to the District Court to Withdraw the Reference as to all matters other than the claims based on violations of the discharge injunction, as it is this Court's opinion that the court must have subject matter jurisdiction to enter final Orders, which it does not have, and that counsel can not confer jurisdiction if it does not otherwise exist.  The parties agreed in District Court that the bankruptcy court had "authority" to enter final Orders, but only if the bankruptcy court determined that dismissal of any or all of the matters was appropriate.  Any matters not dismissed would "need to be decided by the District Court."  Thereafter, the District Court entered its Order declining to withdraw the reference to the Bankruptcy Court.

### III.  Subject Matter Jurisdiction

A preliminary discussion about this Court's jurisdiction is in order.  The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in and limited by statute. *Celotex v. Edwards,* 514 U.S. 300, 307 (1995).  Pursuant to 28 U.S.C. § 1334(b), district courts have jurisdiction over "civil proceedings arising under title 11, or arising in or related to cases under title 11." Bankruptcy judges "constitute a unit of the district court," 28 U.S.C. § 151, and the district court may refer to them "any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 157(a). The United States District Court for the Southern District of Indiana refers all cases or proceedings that "arise under", "arise in" or are "related to" a case under Title 11 (the Bankruptcy Code) to the Bankruptcy Judges of this District by general order dated July 11, 1984.  The jurisdiction of the bankruptcy courts is thus "derivative" because it flows from the statutory grant of jurisdiction to the district courts. *Matter of FedPak Systems, Inc.* 80 F.3d 207, 213 (7th Cir. 1996); *In re K & L, Ltd.,* 741 F.2d 1023, 1028 (7th Cir.1984).

---

[2] Dkt. 20
[3] Dkt. 24

A bankruptcy case or proceeding "arises under" title 11 when the cause of action is based on a right or remedy expressly provided in the Bankruptcy Code. *In re Kewanee Boiler Corp.,* 270 B.R. 912, 917 (Bankr. N. D. Ill. 2002). "Arising in" jurisdiction exists when the proceeding does not arise under a specific statutory provision of the Bankruptcy Code but would have no practical existence but for the bankruptcy. *Banc of Am. Inv. Serv., Inc. v. Fraiberg (In re Conseco),* 305 B.R. 281, 285 (Bankr. N. D. Ill. 2004). Proceedings that "arise in" or "arise under" a bankruptcy case are "core" proceedings in which bankruptcy judges are authorized under 28 U.S.C. §157 to enter Final Orders and judgments.  See, *Ortiz v. Aurora Health Care,* 665 F.3d 906, 911 (7th Cir. 2011), quoting, *Stern v. Marshall,* 131 S.Ct. 2594, 2605 (2011).

The Seventh Circuit views "related to" jurisdiction narrowly to include only those proceedings that affect the amount of property for distribution from the estate or the allocation of property among creditors. *FedPak Sys., Inc.,* 80 F.3d at 213–14; *Home Insurance Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir.1989); *In re Xonics, Inc.,* 813. F.2d 127, 131 (7th Cir.1987). [4]  Bankruptcy judges may also hear, *but may not enter final orders or judgments on,* proceedings which are "related to" the bankruptcy case.

The Plaintiffs' original complaint (Dkt. 1) filed August 31, 2021 and the Amended Complaint (Dkt. 86) filed August 23, 2022 (to which the Defendants' motions to dismiss pertain) are substantially identical other than the Amended Complaint added two counts alleging violation of Indiana consumer protection statutes. The Defendants also moved to dismiss the original complaint.  Recognizing that all counts of the original complaint - other than the bankruptcy discharge violation count for contempt and sanctions which is Count V of the original complaint and Count VII of the amended complaint - are not within its "core" jurisdiction, this Court expressed trepidation about entering a final order in this matter.  It suspended

---

[4] Compare *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984) which established the more lenient and  much-cited standard adopted by other circuits that a "related to" proceeding is one where "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."

briefing on all pending motions and scheduled a status conference for January 5, 2022.

Specifically addressing the jurisdiction issue, the Court questioned whether it had *any* jurisdiction since the Plaintiffs' bankruptcy cases had been closed. (Transcript, Dkt. 49, page 9 of 11, line 9-14). The Plaintiffs averred that this Court has both personal jurisdiction and subject matter jurisdiction pursuant to 28 U.S.C. §§157(b)(2) and 1334. (Dkt. 1, ¶8; Dkt 86, ¶9). The Defendants maintained that this Court has jurisdiction because "the claims that are asserted in the complaint really do boil down to allegations of a discharge violation." (Transcript, Dkt. 49, page 7 of 11, line 14-16). The parties reported to the Court that neither would move the District Court to withdraw the reference and that, to the extent any of the claims were "non-core", they consented to this Court's entry of a final order on those claims for purposes of the motions to dismiss. The Court on its own recommended withdrawal of the reference (Dkt. 50) and the District Court declined, based on the parties' consent to entry by the bankruptcy court of a final order on the non-core claims.

Lack of subject matter jurisdiction may be raised at any time and a court has an independent duty to inquire as to such, even if the litigants do not raise the issue. Fed. R. Bankr. P. 7012(h); *In re Dircks*, 329 B.R. 687, 689 (Bankr. C. D. Ill. 2005) (bankruptcy judge noted that "this court has jurisdiction to determine its own jurisdiction" where defendant did not raise the issue). Because subject matter jurisdiction can be raised at any time, it cannot be waived. *In re Trutko-Clayton*, 384 B.R. 813, 816 (Bankr. N. D. Ind. 2007). Parties cannot confer subject matter jurisdiction on a court by consent. *Id.*; *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 700 (Bankr. N. D. Ill. 2011).

In this Court's view, the parties' consent to this Court's entry of final orders over "non-core" claims for purposes of the motions to dismiss does not resolve the jurisdiction issue. The so-called "non-core" claims are not "related to" the bankruptcy cases. All named Plaintiffs have received their bankruptcy discharges and their bankruptcy cases have been closed, with the exception of O'Flynn's which was reopened for the sole purpose of filing this adversary proceeding. The bankruptcy

cases themselves need no further administration. Any recovery by the Plaintiffs will not affect the amount of property available for distribution to their creditors or the allocation of their property among them. [5] With the exception of Count VII of the Amended Complaint, this Court does not have even "related to" jurisdiction. *In re Smith*, Case No. 06-02699-AJM-13, 2012 WL 1565454 at *3-4 (Bankr. S. D. Ind. May 2, 2012) (no "related to" jurisdiction over FDCPA claim where debtor received discharge and bankruptcy case had been closed, reopened only to file adversary proceeding); *In re Taylor,* Case No. 08-12057-JKC-7, 2010 WL 148253 at *2 (Bankr. S. D. Ind. January 12, 2010) (no "related to" jurisdiction over FDCPA and Indiana state law claims where debtor received discharge); *In re Fisher,* 151 B.R. 895, 897 (Bankr. N. D. Ill. 1993) (no "related to" jurisdiction over absent class members' claims related to servicer's escrow practices); *In re Fry*, Case No. 96-B-28444, 97 A 00184, 1997 WL 666152 at*4-5 (Bankr. N. D. Ill. October 28, 1997)(no "related to" jurisdiction over RICO claims, noting that, in light of the Seventh Circuit's narrow interpretation of "related to" jurisdiction, an action must have a "direct and substantial impact" on the pool of assets available for distribution to creditors); *In re Greer*, 621 B.R. 514, 517 (Bankr. M.D. Fla. 2020) (no "related to" jurisdiction over post-petition RESPA claim).

The parties have proceeded on the assumption that this Court, at a minimum, has "related to" jurisdiction and that all claims except those under Count VII are "non-core" claims. This Court concludes otherwise but dutifully follows the District Court's directive to hear and decide the motions to dismiss. It does so in the form of a report and recommendation given the jurisdictional uncertainty.

## IV.  Rule 12(b)(6) Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure (made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7008) requires that a

---

[5] Absolutely nothing in the record or otherwise asserted by the Plaintiffs suggests that the orders confirming the Plaintiffs' chapter 13 plans provided that any recovery from claims against lenders or servicers would be devoted to their respective plans.

pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief. Detailed factual allegations are not required, but the complaint must allege facts that "state a claim to relief that is plausible on its face" and are "enough to raise a right to relief above the speculative level*." Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A motion to dismiss under Rule 12(b)(6) (Fed. R. Bankr. P. 7012) for failure to state a claim tests the sufficiency of the complaint, not the merits of the case. *Wright v. Thompson*, Case No. 4:12-cv-10-RLY-WGH, 2012 WL 2401532 at *1 (S. D. Ind. June 25, 2012); *Second Amendment Arms v. City of Chicago*, Case No. 10-cv-4257, 2012 WL 4464900 at *3 (N. D. Ill. September 25, 2012). The court accepts all well pled factual allegations as true and draws all inferences in favor of the plaintiff. *Prosser v. Capital One Bank (USA), N.A.,* Case No. 1:20-cv-01117-TWP-TAB, 2021 WL 6050015 at *2 (S. D. Ind. December 21, 2021). However, a court is not obliged to accept as true legal conclusions or unsupported conclusions of fact. *Gibson v. Eagle Family Foods Group, LLC,* Case No. 1:22-cv-02147-TWP-MKK, 2023 WL 5574625 at *2 (S. D. Ind. August 29, 2023).

## V. Discussion

### A. Notice and Cure Provisions Applicable to Novak and Wilhold

Ocwen urges dismissal of all claims against it made by Wilhold and Novak because they failed to allege that they gave Ocwen pre-suit notice of their claims and the opportunity to cure as required under their mortgages. [6] Both Wilhold's and Novak's mortgages provide:

---

[6] Copies of both Novak's and Wilhold's mortgages were attached as exhibits to Ocwen's motion to dismiss (Dkt. 94) and are identical and thus will be referred to in the singular as "mortgage". The mortgage is central to the Plaintiffs' claims and the Plaintiffs have not disputed them in terms of authenticity. The Court's consideration of the mortgage does not convert the motion to dismiss to a motion for summary judgment. *Charles v. Deutsche Bank National Trust Co.*, Case No. 1:15-cv-21826 RMM, 2016 WL 950968 at *3 (S.D. Fla. March 14, 2016).

> Neither Borrower nor Lender may commence… any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

Mortgage §20.  Section 15 requires that notice be in writing. The notice and cure provision comes from standard language used in Fannie Mae/ Freddie Mac forms. *Smith v. Flagstar Bank, FSB,* Case No. C 18-02350 WHA, 2018 WL 3995922 at *4 (N. D. Cal. August 21, 2018).

The Plaintiffs assert that (1) the notice and cure provision applies only to the borrower and the lender, not to Ocwen, a loan servicer, (2) the claims alleged by Novak and Wilhold do not arise from actions pursuant to or duties owed under the mortgage and thus are not covered by the notice and cure provision and (3) even if they are, Novak and Wilhold adequately pled compliance with the provision.

### 1.  Who may Enforce?

Ocwen asserts it is an "assign" of the lender and thus may enforce the notice and cure provision under the last sentence of Section 13 of the mortgage which provides that "[t]he covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender."

The Amended Complaint (Dkt. 86) is replete with allegations of services performed by Ocwen on the lender's behalf.  Specifically, Ocwen: performs ancillary services which are purportedly designed to protect the lender's interest in property (¶4); services consumer mortgage loan accounts, and the amended complaint further describes how owners of mortgages "sell the mortgage servicing rights to mortgage servicers and enter into contractual agency relationships authorizing the mortgage servicers to collect payments from borrowers, handle accounts involved in bankruptcy proceedings or foreclosures, communicate with borrowers…" (¶14, fn 1); appeared in and participated in Novak's bankruptcy case (¶157);  filed a response to Notice of

Final Cure Payment in both Novak's and Wilhold's bankruptcy cases (¶159, ¶196); made adjustments to Novak's mortgage account and initiated collection efforts against him (¶164-167); performed escrow analysis, and ceased or was late paying property taxes on Novak's account (¶173, ¶174); filed a proof of claim in Wilhold's bankruptcy case (¶193); and began collection efforts against Wilhold (¶202). Furthermore, the Amended Complaint alleges that an agency relationship existed between Ocwen and the lenders, as it provides that Novak's and Wilhold's mortgages were to be reinstated after they exited bankruptcy and that "…any right of Ocwen, as *mortgage servicer and agent of the owner of the mortgage loan account*, to recover any amounts alleged to have arisen prior to his bankruptcy was thereby extinguished" (¶161, ¶200) (emphasis added).

The first paragraph of Section 20 of the mortgage defines "Loan Servicer" and provides in part that "(a) sale might result in a change to the entity (known as the "Loan Servicer") that collects Periodic Payments…and performs other loan servicing obligations under the Note and this Security Instrument and Applicable Law". Courts interpreting identical language have determined that a "servicer" is an assignee of the lender and may enforce the notice and cure provision. See, *Charles* at *2. (notice and cure provision applied to loan servicer where complaint alleged the existence of an agency relationship and was replete with allegations of the servicer's performance of property inspections, issuance of payoff statements and responses to borrower's inquiries); *Costello v. Ocwen Loan Servicing, LLC*, Case No. 17-80885-CIV, 2018 WL 11368402 at *5 (S. D. Fla. January 29, 2018)(loan servicer entitled to enforce notice and cure provision where servicer "effectively acquired the rights and obligations of the lender" in carrying out its obligation to service the loan and servicer's actions were in furtherance of the agency relationship with the lender); *Smith* at *4 (loan servicer is assignee of the lender with respect to the collection of the loan payments and is entitled to relief under Section 20); See also, *Rodriguez v. Rushmore Loan Management Services*, Case No. 18-cv-1015, 2019 WL 423375 at *5 (N. D. Ill. February 4, 2019). (definition of "Loan Servicer" in Section 20 of the

mortgage gave the loan servicer an "identifiable interest" in the mortgage, thus giving the loan servicer the protection of the notice and cure provision). Ocwen may enforce the notice and cure provision.

### 2. Whether Notice and Cure Provision Applies to Novak's and Wilhold's Claims

To determine whether claims fall within the scope of the notice and cure provision, a court must decide "whether the action arises from the Defendant's actions pursuant to the mortgage or from Defendant's breach of any provision of or any duty owed by reason of the mortgage." *Costello* at *2. A claim relates to a contract "when the dispute occurs as a fairly direct result of the performance of contractual duties" *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001). The fact that a dispute could not have arisen "but for" the mortgage does not mean that the claim is "related to" the mortgage. Courts have been careful to not give an unduly expansive definition to the term "related to", holding that there must be a direct relationship between the claim and the duties of the lender/servicer under the mortgage. *Mills v. Select Portfolio Servicing, Inc.*, Case No. 18-cv-61012, 2018 WL 5113001 at *4 (S. D. Fla. October 19, 2018).

Novak in the Amended Complaint alleges that Ocwen: manufactured a state of delinquency with a negative escrow balance and assorted fees and costs not disclosed in a Fed. R Bankr. P. 3002.1 statement (¶162); adjusted fees with no notice (¶164); deducted money from a suspense account but did not apply it elsewhere; (¶166); made material misrepresentations as to the loan balance, loan status, and ability to collect fees charges and costs (¶168); mispresented the status of escrow account (¶169); misrepresented the status of the loan and failed to inform Novak of the merger of Ocwen and PHH (¶170); included false information in its response to the Notice of Final Cure (¶171); conducted an inadequate escrow analysis and failed to pay property taxes from escrow (¶173, ¶174); failed to provide pre acceleration notice of default and right to cure letter before filing foreclosure (¶180); continued to report inaccurate information to credit agencies (¶184) and allowed AltiSource to retain 3rd party to enter Novak's home and remove his personal belongings (¶185).

Wilhold alleges that Ocwen: began efforts to collect inflated amounts and reported inaccurate information to credit reporting agencies (¶202); materially mispresented the loan balance, loan status, and Ocwen's ability to collect such amounts (¶203); misrepresented the status and loan amount in a monthly mortgage statement (¶204); misrepresented that the escrow account contained a shortage and fraudulently increased monthly payment (¶205); included false information in the proof of claim and response to Notice of Final Cure filed in Wilhold's bankruptcy case (¶206); and changed Wilhold's account number. (¶209)

Sections 1 and 2 of the mortgage collectively contemplate the establishment of an account and deal with principal and interest due, prepayment charges, late fees, and how payments are to be applied. Section 3 provides that the borrower shall pay taxes and insurance into escrow and describes how the escrow funds are to be handled. Section 4 provides that the borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the property. Section 7 allows Ocwen to conduct reasonable entries upon and inspections of property and Section 9 gives Ocwen the authority to do whatever was reasonable or appropriate to protect the lender's interest in the property, including securing the property. Section 14 expressly provides that the lender may charge the borrower fees for services performed in connection with the borrower's default, including property inspection and valuation fees. That section also provides that, "[i]n regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee." The first paragraph of Section 20 provides that borrower receive written notice of a change in loan servicers. The second paragraph – the notice and cure provision—requires both the borrower and the lender to give pre-suit notice in writing, which includes a lender's notice to a borrower regarding default and notice of filing a foreclosure action. Section 22 describes what a pre-acceleration notice should contain.

Nearly all of Novak's and Wilhold's claims concern loan status, loan balance, fees charged and the alleged mishandling of the escrow account, including payments

that were to be made from escrow and failure to give pre-acceleration notice of default. Novak in addition alleges wrongdoing in a third party's entry into his home to remove his personal belongings. These allegations are directly related to Ocwen's duties and obligations contained in the sections of the mortgage as set out above.

However, both Novak and Wilhold allege in the Amended Complaint that Ocwen reported inaccurate information to credit reporting agencies, (¶184, ¶202). Plaintiffs incorporate these allegations under all Counts of the Amended Complaint (¶247, ¶290, ¶299, ¶312. ¶321, ¶336, ¶344 and ¶364). Ocwen has not identified any provision in the mortgage that deals with reporting the borrower's loan status to credit agencies. While the alleged breaches of these statutes may not have occurred "but for" the mortgage and thus may be connected, they are not directly related to the performance of Ocwen's duties under the mortgage. Novak's and Wilhold's claims that include inaccurate reporting to credit agencies do not fall under the notice and cure provision and thus Novak and Wilhold were not required to give Ocwen pre-suit notice. *Colon v. Nationstar Mortgage, LLC,* Case No. 1:15-cv-22961 UU, 2015 WL 7422598 at *2 (S. D. Fla. November 17, 2015)(stating that the notice and cure provision "cannot be stretched to ensure pre-suit conduct concerning a consumer protection statute that is not directly connected to the performance of the duties in the Mortgage").

Novak and Wilhold in Count VII allege violations of §524 and Fed. R. Bank. P. 3002.1 with respect to Ocwen's responses to Notices of Final Cure Payment and its failure to disclose fees and charges in the Plaintiffs' bankruptcy cases. These acts are alleged violations of the Bankruptcy Code and Rules but not breaches under any provision of the Mortgage and thus, are not covered by the notice and cure provision. Novak and Wilhold were not required to give Ocwen pre-suit notice of this claim.

### 3. Compliance with Notice and Cure Provision Not Adequately Pled

With respect to the claims to which the notice and cure provision applies, neither Novak nor Wilhold adequately plead compliance with that provision. Novak

alleges that he "made attempts to notify" Ocwen "of the foregoing" alleged missteps with respect to his account.(¶176). Wilhold alleges that he "made numerous attempts to obtain information" about his increased monthly payment after he exited bankruptcy and how he notified Ocwen of "his concerns about how this was affecting him" (¶208). Both Novak and Wilhold alleged that Ocwen knew they mishandled their respective accounts even without their communicating the same to Ocwen. ¶183, ¶211). At best, Novak's and Wilhold's communications with Ocwen sought information but did not give notice of any alleged breach by Ocwen of a duty or an obligation under the mortgage. Nowhere did Novak or Wilhold even generally plead compliance with the notice and cure provision, let alone that they gave Ocwen written notice of any alleged breaches under the mortgage. Because of this failure, the Court recommends that Ocwen's motion to dismiss should be granted as to all of Novak's and Wilhold's claims other than those with respect to inaccurate reporting to credit reporting agencies.

### B. Racketeer Influenced and Corrupt Organizations (RICO and RICO Conspiracy, Counts I and II)

Plaintiffs have alleged in Count 1 of their Complaint that the Defendants violated 18 U.S.C. §1962(c) which proscribes certain activities: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The statute creates both criminal and civil liability for those who engage in a "pattern of racketeering activity" in one of four ways: by investing the proceeds of the pattern in an enterprise,[7] by acquiring an interest in or control of an enterprise through the pattern,[8] by participating in the enterprise through the pattern,[9] or by conspiring to do any of

---

[7] 18 U.S.C. § 1962(a)

[8] § 1962(b)

[9] § 1962(c)

those things. [10]  Racketeering activity includes any one of 35 crimes,[11] and, in order to count as a pattern, at least two such acts must be committed. [12]   The statute defines the term person to include "any individual or entity capable of holding a legal or beneficial interest in property." [13]  Defendants do not challenge the allegation that both PHH Mortgage Corporation (a/k/a Ocwen Financial Corporation) and AltiSource Solutions, Inc. are a "person" for purposes of the application of this statute.

"[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;" [14]   Defendants strongly dispute that they constitute an "enterprise".  "[A] RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000).  The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Therefore, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *Goldin Indus., Inc.*, 219 F.3d at 1275; *Hyundai Motor America Corporation v. EFN West Palm Motor Sales, LLC*, 641 F. Supp. 3d 1321, 1331 (S.D.Fla. 2022).  "To conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

---

[10] § 1962(d)

[11] § 1961(1)

[12] § 1961(5)

[13] § 1961

[14] § 1961

A plaintiff in a civil RICO action must identify and prove a pattern of racketeering activity, defined as "at least two 'predicate acts' of racketeering activity, the last of which occurred within the last ten years." *Tucker v. Morris State Bank*, 154 F. App'x 183, 185 (11th Cir. 2005) (citing 18 U.S.C. § 1961(5)). "An act of racketeering activity, commonly known as a 'predicate act,' includes any of a long list of state and federal crimes." *Cisneros*, 972 F.3d at 1215 (citing 18 U.S.C. § 1961(1)). *Hyundai Motor* at 1332.

Additionally, "[a] civil plaintiff must also show '(1) the requisite injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation.'" *Ray v. Spirit Airlines,* 836 F.3d 1340, 1348 (11th Cir. 2016). The Defendants have not argued Plaintiffs have failed to allege a pattern of racketeering activity or an absence of predicate acts. The motion, as far as the RICO allegations, rests upon a failure to adequately plead an enterprise existed.

Plaintiffs state certain persons known and unknown constitute an "association-in-fact" and describe these Defendants as persons "who have taken the steps…relating to the servicing of loans and the failure to abide by order of Bankruptcy judges and failing to comply with the requirements of the Bankruptcy Code;…collaborated and colluded with each other and with other associates to seek to obtain from Plaintiffs…payments in excess of those owed…as well as other acts set forth relating to seeking to obtain debt payments in excess of those lawfully due and falsely reporting loan balances and delinquencies to credit reporting agencies." (Dkt. 86 ¶253). Plaintiffs further allege that the enterprise consists of persons associated together for a common purpose and had an ongoing organization with an "ascertainable structure and functioned as a continuing unit with separate roles and responsibilities". (Dkt. 86 ¶254) Plaintiffs distinguish the activities of the Enterprise with the activities of Ocwen itself, alleging that Ocwen serviced loans outside of bankruptcy and the borrowers on those loans never received collection communications. Likewise, AltiSource made money by performing ancillary services for companies other than Ocwen. In other words, the allegations are that these two

companies did the same work within the Enterprise as they did lawfully outside the Enterprise and, therefore, the Enterprise was separate and distinct. However, "[a]n enterprise is not, for instance, the same as a pattern of racketeering activity. Instead, an enterprise "is an entity separate and apart from the pattern of activity in which it engages." *Catano v. Capuano*, No. 18-20223-CIV, 2019 WL 3035752 at *6 (S.D. Fla. July 11, 2019).

Plaintiffs argue Ocwen was an important partner in the Enterprise because it controlled the communications and relationships with the debtors. AltiSource's contribution to the alleged Enterprise consisted of performing property services and thereafter financially benefitting through direct payments and increased share value of their common shares when Ocwen induced borrowers to pay money they didn't owe

*Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 226 (7th Cir. 1997) has a fact pattern not dissimilar from the present case. Therein, the complaint charges Chrysler with many violations which all boil down to a claim of warranty fraud. The question presented was whether Chrysler was "associated with an enterprise" and "conduct[ed] ... such enterprise's affairs through" the wire and mail frauds. The enterprise alleged a "Chrysler family" which consisted of subsidiaries of the Chrysler Corporation engaged in various facets of production, financing, and marketing of Chrysler automobiles, plus Chrysler's dealers, plus trusts controlled by Chrysler that in essence resell retail installment contracts for the purchase of Chrysler automobiles to the investing public. The Plaintiffs argued that all these affiliates and agents participated directly or indirectly in the retail sale of Chrysler automobiles and accessories, of which the extended warranty is one; hence the affairs of the entire "enterprise" were conducted through a pattern of fraudulent acts.

In *Fitzgerald*, Judge Posner expounds on the span of acceptable iterations of an Enterprise under the RICO statute. The prototypical case is one where a person determined to violate the law seizes a legitimate firm and uses that firm's resources and facilities to commit criminal acts. The next stage in the evolution of a criminal Enterprise is one where the criminal mostly continues the legitimate business of the

16

firm but utilizes it to engage in criminal activity. Many of the firm's employees may not even be aware of the illegal activity occurring. The final stage in the continuum of what may constitute an Enterprise under RICO is applying RICO to a free-standing corporation. In the case of Chrysler, it does business through agents as nearly every manufacturer does. However, if it was one larger corporation that included all the corporate activities in one entity, it could not be made liable. Posner found no support for encouraging such vertical integration to avoid liability under RICO. The Chrysler dealerships were merely a "conduit" and lent an element of legitimacy despite participating in the activities of the corporation. The present case leans toward the *Fitzgerald* facts and conclusion.

A District Court decision out of the Seventh Circuit, *Taylor v. Ocwen Loan Servicing, LLC*, No. 4:16-cv-04167-SLD-JEH, 2017 WL 3443209 (C.D. Ill. August 10, 2017.), was decided on a motion to dismiss, and has very similar facts to the present case, except no discharge injunction violation was pled. *Taylor* expounds upon the traits of an Enterprise under the RICO statute. "[a]n enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]'" 18 U.S.C. § 1961(4). "While a RICO enterprise can be formal or informal, some type of organizational structure is required." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). "A RICO enterprise is '"an ongoing "structure" of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.' " *Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 644 (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)); *see Boyle v. United States*, 556 U.S. 938, 946 (2009) (stating that a RICO enterprise requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes."). Logically, the defendant, whether natural person or corporation, must be distinct from the other participants in the alleged enterprise.

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013).

*Taylor*, like the case before the court, alleged Ocwen's officers, executives and other employees participated in the unlawful scheme without adding more detail about what individual Ocwen agents might have done which added nothing to the description of the Enterprise. *See Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (holding that enterprise cannot be demonstrated "merely by showing that the pattern of predicate acts ... were committed by a firm that has agents or affiliates ... The firm must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality.")

O'Flynn and the other Plaintiffs describe the overlap between Ocwen and AltiSource, with the combination of both organizations comprising the Enterprise. Plaintiffs state Ocwen spun off certain business activities to form AltiSource in 2009 to increase its revenue by charging for technology and ancillary services. Ocwen is AltiSource's largest customer and AltiSource's revenue from Ocwen was 54%, 56% and 52% for the years ending in 2020, 2019 and 2018. Ocwen's Board Chair, William Erbey, continues to hold, directly or indirectly, one of the largest ownership interests in both Ocwen and AltiSource. He was also AltiSource's Board Chair. The Chief Risk Officer served in that same role for both companies. Ocwen's CEO moved to the same role with AltiSource when the spinoff occurred. The controlling shareholders of Ocwen were, and may still be, the controlling shareholders in AltiSource. Former CEO Ron Faris and current Executive Vice President and Chief Servicing Officer Scott Anderson own large shares of both companies. AltiSource's Lead Independent Director, Scott Berg, is the Chief Investment Officer and Managing Partner of Deer Park Road Management, which is "amongst the very largest owners of Ocwen at 13,356,147 shares or 10.3% of outstanding common shares". (Dkt. 86 ¶55) William

18

Shapiro, AltiSource's CEO, is alleged to be, or was at some time, a large shareholder of Ocwen.

Ocwen and AltiSource have both profited from the long-term servicing agreements they entered into when the spinoff occurred. AltiSource receives revenue for the property services it bills on accounts serviced by Ocwen and Ocwen allegedly marks those charges up and passes them along to property owners. AltiSource earns revenue for each loan "boarded" onto its technology platform.

Plaintiffs allege and complain that the technology used by Ocwen and transferred to AltiSource was corrupted and inaccurate. The technology was not replaced with the best in class software, Black Knight MSO. Plaintiffs state that the data was simply transferred from one system to the other without an audit or corrections to the data being made.

In July 2020, Ocwen started transitioning to another field services provider away from AltiSource at the request of a customer and a separate request from an investor. AltiSource has not sued Ocwen for breach of the long term servicing agreement. Several Consent Decrees and Consent Orders have been entered into by Ocwen whereby Ocwen agreed to perform audits and corrections to data but, according to the Complaint, Ocwen has not complied. These Consent Decrees indicate an awareness by Ocwen of the deficiencies in its systems since 2011.

The sum and substance of Plaintiffs' allegations that Ocwen (a/k/a PHH) and AltiSource constitute an Enterprise are as follows. Ocwen derives a profit from the services AltiSource provides and marks them up, whether the services are performed for debtors in bankruptcy or not. AltiSource derives profit from the assignments sent to it from Ocwen, whether the services are performed for bankruptcy debtors or others. Ocwen knew data it relied upon and sent to AltiSource was corrupted and inaccurate. Only Ocwen has contact with property owners and AltiSource has no communication with property owners. There is significant overlap of ownership and leadership between the two defendants. The profits derived by Ocwen and AltiSource

(dividends and share value) from their malfeasance are shared in the same manner as the profits from the general business activities of both corporations. There are no allegations that AltiSource committed any malfeasance or illegal activity apart from performing property services at Ocwen's request, allegedly at inflated prices. In other words, persons involved in the Enterprise do not exclusively reap the profits from their malfeasance, the profits are shared by all without regard to being a participant in the Enterprise. The defendants simply have aligned interests. The allegations amount to a typical run of the mill commercial relationship that runs off the rails in the case of some loans in bankruptcy, due to the failure of only one party to abide by the rules of the bankruptcy system. For the reasons set forth above, the Court recommends that Counts I and II, violations of RICO, be dismissed.

### C. Fair Debt Collection Practices Act (Count III)

Plaintiffs allege violations of the Fair Debt Collection Practices act under 15 §§1692(d), 1692(e), and 1692(f); which apply only to "debt collectors". The Act defines "debt collectors" as anyone who "regularly collects or attempts to collect ... debts owed or due ... another[,]" generally meaning a debt must be in default before it is acquired. 15 U.S.C. §1692(a)(6).

The Amended Complaint alleges that Ocwen violated the FDCPA in the following ways: §1962(e) by its misrepresentation of the character amount, or legal status of the loans; §1962(e)(8) by inaccurately reporting to credit agencies without noting the debts were in dispute; §1962(e)(10) by using false representations through loan statements; §1962f by attempting to collect amounts not permitted by law; §1962(d) by utilizing unfair and unconscionable means to collect the debt. (Dkt. 86, page 53 of 54).

Ocwen argues that Plaintiffs' claims under the FDCPA should be dismissed because Plaintiffs "never allege their loans were in default when Ocwen began servicing them." (Dkt. 94 page 45 of 63). As support Ocwen cites *Bailey v. Security Nat'l Servicing Corp.* for the proposition that "an individual is not a 'debt collector'

subject to the Act if the debt he seeks to collect was not in default at the time he purchased (or otherwise obtained) it." 154 F.3d 384, 387 (7th Cir. 2003). See also *Schlosser v. Fairbanks Cap. Corp*, 323 F. 3d. 534, 536 (7th Cir. 2003); *Wagoner v. Npas, Inc.*, 456 F. Supp. 3d 1030, 1035 (N.D. Ind. 2020).

Contrary to Ocwen's arguments, the Court has identified sufficient language in the Amended Complaint to overcome the requirements of the 12(b)(6) motion. "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (citing *Twombly*, 550 U.S. at 555).

As noted earlier herein, the Plaintiffs must put forth a short and plain statement showing the plaintiff is entitled to relief and the facts therein must be plausible. First off, the Plaintiffs allege that Ocwen is a debt collector because "it obtained servicing rights to the loans at issue and began servicing them after an incident of default". (Dkt. 86, page 53 of 65). Until an answer is filed or discovery commenced, Ocwen is the only party to this matter who has access to the date it acquired servicing rights and to the status of the loans on the date they were acquired. Only Ocwen has this important information until it can be discovered by Plaintiffs.

The Amended Complaint sufficiently alleges that Ocwen/PHH began servicing the loans "after an incident of default." This is a statement of fact establishing that Defendant meets the criteria set forth in § 1692a(6).

The key issue raised by Defendants is the timing of when Ocwen started servicing the loans. It can not be disputed that Plaintiffs do not have access to this

information and therefore their allegations are based upon the best information available.  Defendants argue that the only allegation that Ocwen is a debt collector is because "it obtained servicing rights to the loans at issue and began servicing them after an incident of default" which in and of itself should suffice.  In addition, according to the Amended Complaint, Plaintiff O'Flynn paid additional funds into his bankruptcy plan to address arrearages and a Notice of Final Cure was filed.[15] Ocwen's Proof of Claim filed in O'Flynn's bankruptcy makes a claim for arrearages in the sum of $2280.80.[16]  This suffices to support the fact a prepetition default occurred in O'Flynn's mortgage note.

Novak filed his bankruptcy case on March 10, 2011, the Plan was confirmed on October 8, 2014 and the discharge was entered on March 18, 2016.  Ocwen appeared in the case by way of filing a transfer of claim on July 7, 2014 from Homeward Residential, Inc.[17]  It is clearly stated in the Proof of Claim that the lender made no claim for an arrearage and Novak's Chapter 13 Plan states there are no arrearages.[18] Even though Plaintiff has alleged Ocwen was a debt collector as to his case, the facts pled indicate otherwise.  Therefore, Novak's claim against Ocwen/PHH under the FDCPA should be dismissed

 Wilhold had accumulated arrears owed to Ocwen prior to filing for bankruptcy. [19]  Wilhold's bankruptcy plan, referenced as Filing No. 2 in Wilhold's bankruptcy, states that the arrearages totaled $15,534.  The Amended Complaint alleges that Ocwen retained $750.22 and remitted $956.24 to HSBC from every Trustee payment it received.  Therefore, there is sufficient factual allegations to establish that the loan was in default and the claim should not be dismissed.

Addisons' mortgage declares bankruptcy to be an event of default: "Borrower shall be in default if any action or proceeding…is begun that …could result in the

---

[15] Dkt 86,¶ 129, 130, 132.

[16] Dkt. 86, ¶ 27 and Proof of Claim filing No. 2

[17] Dkt. 86 ¶ 157

[18] See Novak case, INNB 11-20744-KL

[19] Dkt. 86, ¶ 191, 192

forfeiture of the property or other material impairment of Lender's interest in the property…."[20]  More significantly, the Addisons' Note was in a state of default which was resolved by agreement to roll the arrearage into the principal.[21]

With the exception of Novak's FDCPA claim, the Amended Complaint accurately alleges that the other loans serviced by Ocwen were in default.  Since the Plaintiffs plausibly assert that Ocwen is a debt collector and Ocwen is the sole party with access to refute this assertion, the Court recommends that Ocwen's motion to dismiss should be denied at this time as to O'Flynn's, Wilhold's , and Addisons' claims.

## 1.  Statute of Limitations

FDCPA claims must be brought "within one year from the date on which the violation occurs." 15 U.S.C. §1692k(d). Accordingly, the "limitations period begins to run on the date the alleged FDCPA violation actually happened." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019). In *Rotkiske* the Supreme court unambiguously held that the general discovery rule does not apply to claims under §1692k(d) absent the application of an equitable doctrine. *Id.*

In *Rotkiske*, the plaintiff's argument was based on two concepts, the application of a general discovery rule and the application of a fraud specific discovery rule as an equitable doctrine. *Id.* The court squarely addressed the first but did not analyze the second because the debtor failed to preserve the issue before the court of appeals and in his petition for certiorari. *Id.* at 361. The court determined that, based on the statutory language, there is no general discovery rule for claims under the FDCPA and rejected the argument that the limitations period begins to run upon discovery of a violation. The court left open the possibility that an equitable doctrine could apply. The court stated that "this [c]ourt has noted the existence of decisions applying a discovery rule in "fraud cases" that is distinct from the traditional equitable tolling doctrine." *Id.* (citations omitted).

---

[20] Dkt. 86 ¶ 65, Claim Filing No. 15-2.

[21] Dkt. 86 ¶ 216 and Filing No. 26

For plaintiffs to successfully claim equitable tolling they must show, "that [they] could not by exercise of reasonable diligence have discovered essential information bearing on the claim." *Obiefuna v. Hypotec, Inc.*, 451 F. Supp. 3d 928, 942 (S.D. Ind. 2020) (citing *Shopshear v. Corp. Counsel of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001)). Courts have cautioned that this doctrine should be "applied sparingly and only where extraordinary circumstances beyond the litigant's control prevented timely filing." *Id.* (internal citations omitted).

"A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses[;] [b]ut when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." *Indep. Tr. Corp. v. Stewart Info. Services Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) citing *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009).

The parties appear to agree that FDCPA claims are generally not subject to the discovery rule and thus Plaintiffs' claims would have had to accrue on or after August 31, 2020 to fall within the one-year limitations period. In an attempt to plead around the timeliness issue, Plaintiffs invoke the fraud-specific discovery rule and have alleged that they could not have reasonably discovered the violation because of Defendants fraudulent concealment of material facts, denial, and misrepresentations. (Dkt. 177 page 52 of 68).

Ocwen points to *Freeman v. Ocwen Loan Servicing* as support that Plaintiffs FDCPA claims are time barred. In dismissing the claims outside of the SOL, the court cited to *Rotkiske* and said that the discovery rule does not apply to FDCPA claims to extend the limitations period that begins to run when the violation occurs. *Freeman v. Ocwen Loan Servicing, LLC*, No. 1:18-cv-03844-TWP-DLP, 2020 WL 7489033, at *3 (S.D. Ind. Dec. 21, 2020), on reconsideration in part, 2021 WL 5140718 (S.D. Ind. Nov. 4, 2021). Similar to the case at hand, in *Freeman,* despite the response to the Notice of Final Cure Payment stating Debtor was current and never missed a payment, Ocwen told plaintiff she was 9 months delinquent on her mortgage payment

in December of 2017. Ocwen applied a property Inspection fee during this time and continued to treat plaintiff as if she was in default into the fall of 2018. *Id.* Ocwen argued that claims prior to December 6, 2017 were time barred as they were outside of the one year limitations period, and the court agreed. *Id.* at 14.

Ocwen also suggests that Plaintiffs' own allegations demonstrate they were immediately aware of Defendant's alleged conduct and violations as evidenced by Plaintiffs' attempts to rectify supposed loan discrepancies. (Dkt. 196 page 21 of 29). Plaintiff's point to the following alleged acts by Defendants as evidence of why members of the Class could not have reasonably discovered the nature of Defendants conduct: (1) "refusing to provide sufficient supporting documentation or honest explanation for the amounts they sought or seek to collect in response to borrower inquiries"; (2) "misrepresenting to Plaintiffs the issues herein were caused by failures by the U.S. Trustee or bankruptcy counsel"; (3) "modifying the loans of affected borrowers and debtors in such a way as to 'cure' the problems by rolling the sought after amounts into their principal balance"; (4) providing payoff statements to borrowers and debtors reflecting amounts "owed" known to be inaccurate and a product of the deficiencies at issue herein; and (5) "decommissioning REALServicing in such a way to deprive borrowers of life of loan data in native format and with date of last change information". (Dkt. 86 page 42 of 65). Plaintiffs further argue that deceptive acts such as these make it "impossible for the borrower to determine if they are victims of mortgage service abuse[.]" (Dkt. 86 page 43 of 65).

The Plaintiffs' Amended Complaint states claims for relief that are plausible and they are enough to raise a right to relief beyond a speculative level. Plaintiffs have plausibly alleged the applicability of a fraud-specific discovery rule that may toll the statute of limitations. Unlike in *Freeman*, Plaintiffs have alleged Ocwen actively concealed the nature of its conduct. (Dkt. 177 at 53 of 63). The Court finds that Plaintiffs have sufficiently alleged an exception to the statute of limitations to move past dismissal.

### D.  Real Estate Settlement Procedures Act (RESPA, Count IV)

Plaintiffs have alleged Ocwen violated the provisions of RESPA, 12 U.S.C. § 2605 [22] and failed to comply with Regulation X, 12 C.F.R. § 1024 *et. seq.*

RESPA is a federal statute requiring certain minimum standards for servicers of mortgage loans and escrow accounts.  The term "servicer" means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan) and Plaintiffs sufficiently allege that Ocwen is a loan servicer.

12 C.F.R. § 1024.17(3) (known as Regulation X) generally requires annual escrow account analyses to determine what the proper payments into escrow for the following year will be.  The servicer must conduct an escrow account analysis at the end of each account computation year and then estimate the amounts to be disbursed during the following year to determine if there is a shortfall or a surplus.  This annual analysis must be provided to the borrower.  The servicer is required to notify the borrower not less than annually of any shortage of funds in the escrow account and failure to do so results in a waiver of the claim for any such shortfall. [23]

Ocwen alleges Plaintiffs have failed to sufficiently plead a violation of 12 U.S.C. § 2605(g) of RESPA:

> **Administration of escrow accounts**
> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due. Any balance in any such account that is within the servicer's control at the time the loan is paid off shall be promptly returned to the borrower within 20 business days or credited to a similar account for a new mortgage loan to the borrower with the same lender.

---

[22] References to section numbers in this section refer to Title 12.
[23] § 2609 (b)

Ocwen argues the named Plaintiffs failed to allege a lack of an escrow analysis as required by the above-referenced statutory obligations. While lenders are exempt from providing the annual escrow account statement to borrowers in bankruptcy [24], the servicer is not exempt from its obligation to conduct the escrow analysis annually and to notify the borrower if there is a shortage or deficiency. *In re Payne,* 387 B.R. 614, 636–37 (Bankr. D.Kan. 2008).

O'Flynn complains of exiting bankruptcy after receiving a discharge in a "manufactured state of default". O'Flynn does not allege a violation of RESPA but rather alleges a failure to comply with Fed. R. Bankr. P.. 3002.1 and attributes it to their continued use of REALServicing software. The Amended Complaint makes no RESPA claim on behalf of O'Flynn and it is recommended such allegation be dismissed with prejudice.

However, Novak alleges Ocwen mailed Novak an escrow statement misrepresenting Novak's escrow account deficiency, ceased paying property taxes from escrow, and failed to perform adequate escrow analysis.[25] Plaintiff Wilhold alleges a misrepresentation in the off-schedule escrow statement.[26] Addison also alleges a misrepresentation in the off-schedule escrow statement.[27] All of these allegations would be violations of RESPA. Therefore, plaintiffs Novak, Wilhold and Addison have adequately pled RESPA claims and it is recommended the Defendant's Motion to Dismiss these claims be denied.

### E. Indiana Deceptive Consumer Sales Act (IDCSA, Count V)

Plaintiffs claim that Ocwen violated the Indiana Deceptive Consumer Sales Act ("IDCSA). The IDCSA provides that a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code §24-5-0.5-3(a). A "consumer transaction" includes "the collection of or attempt to collect a debt by a debt collector". Ind. Code §24-5-0.5-

---

[24] 24 C.F.R. §3500.17

[25] ¶. 169, 173 and ¶174

[26] ¶. 205

[27] ¶231

2(a)(1)(C). A "supplier" is a "person who regularly engages in or solicits consumer transactions…". Ind. Code §24-5-0.5-2(a)(3)(A).

The IDCSA covers two types of deceptive acts. An "uncured" deceptive act is one "with respect to which a consumer who has been damaged by such act has given notice to the supplier" but "no offer to cure has been made to such consumer within thirty (30) days after such notice," or the act has not been cured as to such consumer within a reasonable time after the consumer's acceptance of the offer to cure." Ind. Code §24-5-0.5-2(a)(7). An "incurable deceptive act" is one "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code §24-5-0.5-2(a)(8). A claim based on an "uncured" deceptive act does not include an intent to defraud element but requires notice to the supplier, whereas an "incurable" deceptive act has no notice prerequisite but requires the showing of an intent to defraud or mislead. The Plaintiffs in their response to Ocwen's motion withdrew their IDCSA claim based on an "uncured" deceptive act. (Dkt. 177, page 56) and thus alleges only that Ocwen committed an "incurable deceptive act" under the IDCSA.

### 1. "Incurable Deceptive Act" and Rule 9(b) Standard of Pleading

An IDCSA claim based on an "incurable" deceptive act is subject to the heightened standard of pleading under Fed. R. Civ. P. 9(b) which requires a plaintiff to allege an intent to defraud or mislead, *Gibson v. Eagle Family Goods Group, LLC*, Case No.1:22-cv-02147-TWP-MKK, 2023 WL 5574625 at *5 (S. D. Ind. August 29, 2023); *Freeman* at *17. The Seventh Circuit has determined that the complaint must identify the "who, what, when, where and how" of the alleged fraud in order to meet this heightened standard. *Outzen v. Kapsch Trafficcom USA, Inc.*, Case No. 1:20-cv-01286-TWP-MJD, 2021 WL 914021 at *10 (S.D. Ind. March 10, 2021); *Borsellino v. Goldman Sachs Group, Inc.* 477 F.3d 502, 507 (7th Cir. 2007). A plaintiff must also allege that he relied on the alleged deception. *Crum v. SN Servicing Corp.*, Case No. 1:19-cv-02045-JRS-TAB, 2021 WL 3514153 at *4 (S.D. Ind. August 10, 2021).

28

The Amended Complaint contains an extensive description of the relationship between Ocwen and AltiSource and the overlap of officers and executives between the two; Ocwen's use of REALServicing as its system of record; state and federal regulatory actions in 2011, 2012 and 2014 –prior to the acts complained of here -- against Ocwen regarding the servicing of accounts, including the accuracy of information of borrowers' accounts and application of payments; and Ocwen's "Risk Convergence Reports" (RCR's) which identified its own regulatory violations and areas of risk and other failures associated with its loan servicing practices.  It further alleges that the many risks reported in the RCR's were attributable to coding deficiencies with REALServicing "that created errors autonomously" and that Ocwen "knew these failings would cause Ocwen to misapply funds paid during and after the Chapter 13 case seek to collect upon fees, costs and expenses for which it had no legal right, report inaccurate information to credit reporting agencies, and fail to properly manage escrow accounts." (¶121, ¶123) and that, "[d]espite having this knowledge, Defendants did next to nothing to prevent or correct the harm caused to the Plaintiffs." (¶124).

Plaintiffs further allege in the Amended Complaint that the proofs of claim filed or asserted by Ocwen and Ocwen's responses to the trustees' notices of final cure filed in their respective bankruptcy cases contained materially false information upon which the Plaintiffs and respective chapter 13 trustees relied (O'Flynn at ¶142 and ¶143); (Novak at ¶171 and ¶172);( Wilhold at ¶206 and ¶207); and (Addison at ¶233 and ¶234) and that Ocwen began aggressive collection efforts post-bankruptcy, by sending dunning letters or making automated collection calls and inaccurately reporting the status of their loans to credit reporting agencies and that these collection efforts *contained knowing material misrepresentations upon which each of them relied*.  (O'Flynn at ¶139, ¶140 and ¶145: );(Novak at ¶167, ¶168 and ¶182); (Wilhold at ¶202, ¶203 and ¶210); and (Addison, ¶229, ¶230 and ¶236).  The Plaintiffs specifically allege Ocwen's "unfair, deceptive and misleading" acts and conduct.(¶329, ¶330, ¶332, ¶333 and ¶334).

These allegations go far beyond just alleging loan servicing errors. They collectively provide that Ocwen was aware of the REALServicing deficiencies, failed to timely correct them, and knowingly misrepresented amounts allegedly past due and subject to collection post-bankruptcy by including materially false information in its proofs of claim, responses to Notice of Final Cure Payment, post-bankruptcy dunning letters, automated collection calls and reporting to credit reporting agencies. Count V sufficiently pleads an "incurable deceptive act" under the IDCSA under the heightened standard of Rule 9(b).

### 2. Statute of Limitations

An action under the IDCSA must be brought within two years after the occurrence of the deceptive act. Ind. Code §24-5-0.5-5(b). The statute of limitations may be tolled if the defendant fraudulently conceals the action giving rise to the liability. *Carroll v. BMW of North America, LLC,* 553 F.Supp.3d 588, 613 (S.D. Ind. 2021). Indiana narrowly defines concealment and requires that it be "active and intentional; passive silence is insufficient." The acts of concealment must be affirmative and "must be calculated to mislead and hinder the plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Tolen v. A.H. Robins Co.,* 570 F.Supp.1146, 1151 (N.D. Ind. 1983); *Payton v. Johnson & Johnson, et al.,* Case No. 4:20-cv-00257-JMS-DML, 2021 WL 1923799 at *11 (S. D. Ind. May 13, 2021).

As noted earlier in the FDCPA discussion, the statute of limitations is an affirmative defense and a plaintiff is not required to anticipate and defeat affirmative defenses at the pleadings stage. Dismissal under Rule 12(b)(6) is appropriate only where the complaint sets out all of the elements of the affirmative defense. If there is a "conceivable set of facts, consistent with the complaint, that would defeat the statute of limitations defense", the claim should not be dismissed. *Id.* at *10, quoting *Sidney Hillman Health Ctr. Of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922,928 (7th Cir. 2015).

The Court has recommended that the Plaintiffs have sufficiently pled (1) fraudulent concealment which tolls the FDCPA statute of limitations and (2) sufficient facts to establish an "incurable deceptive act". These well pled facts collectively allege affirmative acts of concealment regarding the status of loans, handling of escrow accounts, Ocwen's knowledge of REALServicing deficiencies and its attempts to cure them, inaccurate responses to Notices of Final Cure Payment and many other matters related to the servicing of the Plaintiffs' loans. Collectively, they establish a set of facts that would defeat the statute of limitations defense and plausibly allege a fraud-specific discovery rule that tolls the statut of limitations. It is recommended that none of the Plaintiffs' IDCSA claims will be dismissed on the basis of the statute of limitations.

### 3. IDCSA Does Not Apply to Wilhold

Ocwen asserts that the IDCSA applies only to consumer transactions that have a connection to Indiana, whether it be a consumer transaction that occurred in Indiana, involved an Indiana consumer, or pertained to a product that was manufactured in Indiana. A "consumer transaction" under the IDCSA is a "…service …to a person for purposes that are primarily personal, familial, charitable, agricultural, or household….". Ind. Code §24-5-0.5-2(a). Nothing in this definition requires the transaction to have occurred in Indiana or involve an Indiana resident. *Graham v. REV Recreation Group, Inc.*, Case No. 1:17-cv-351-TLS, 2018 WL 1334991 at *3 (N.D. Ind. March 14, 2018). However, IDCSA cases between non-Indiana residents involving consumer transactions that occurred outside of Indiana nonetheless had a nexus to Indiana in that the "supplier" of the product or service was from Indiana. See, *Hoopes v. Gulf Stream Coach, Inc.*, Case No. 1:10-cv-365, 2014 WL 4829623 (N.D. Ind. September 29, 2014 (applying IDCSA where Ohio dealer sold an Ohio resident an RV manufactured by an Indiana corporation). At least one court has expounded that the IDCSA applies to out of state consumers and transactions that occurred out of state, as long as they involved an Indiana supplier, and that it would *not* be

> "plainly repugnant to the intent of the legislature" to allow an out-of-state plaintiff who engaged in an out-of-state purchase to bring a claim under the IDCSA. Rather, disallowing such claims would not promote the IDCSA's purpose of "encouraging the development of fair consumer sales practices" if *Indiana suppliers* were able to engage in deceptive practices so long as the consumer was not an Indiana resident.

(emphasis added). *Graham*, at *3. (IDCSA claim allowed to proceed where North Carolina dealer sold Ohio resident an RV manufactured in Indiana). Wilhold is not an Indiana consumer, Ocwen (a Florida citizen, see Dkt. 86 ¶11) is not an Indiana supplier, and Wilhold does not allege that any part of the parties' transaction occurred in Indiana. Thus, Wilhold's IDCSA claim will be dismissed.

### F. Indiana Home Loan Practices Act (IHLPA, Count VI)

The IHLPA prohibits engaging in a deceptive act in connection with a mortgage transaction or a real estate transaction. Ind. Code §24-9-3-7(c) (3). To prevail on an IHLPA claim, a plaintiff must show a "deceptive act" where the defendant knowingly or intentionally made a material misrepresentation or concealed material information regarding the terms or conditions of the transaction. Ind. Code §24-9-2-7(a). "Knowing" means "having actual knowledge at the time of the transaction." *Binns v. Ocwen Loan Servicing, LLC*, No. 1:14-cv-01764-TWP-MJD, 2015 WL 5775827 at *5 (S.D. Ind. April 1, 2015). A deceptive act "in connection with a mortgage transaction" can be inferred to include acts performed in the servicing of a mortgage transaction. *Id.* at fn 5. The plaintiff must first notify the homeowner protection unit and give it at least ninety (90) days to institute appropriate action to redress a violation. Ind. Code §24-9-5-4(e). Like the IDCSA, claims under the IHLPA are subject to the heightened standard of pleading under Fed. R. Civ. P. 9(b). *Caines v. Bank of America, NA by BAC Home Loans Servicing, LP*, Case No..1:11-cv-01557 SEB-DML, 2013 WL 12290265 at *2 (S. D. Ind. June 25, 2013).

Plaintiffs in their Amended Complaint incorporate under this Count allegations of Ocwen's knowing, material misrepresentations with respect to loan balances, status, and Ocwen's ability to collect fees and charges which were otherwise

uncollectible because they had not been disclosed and thus extinguished under the terms of the Plaintiffs' confirmed plans.  (O'Flynn, ¶140; Novak, ¶168; Wilhold, ¶203; Addison, ¶230).  Those allegations are sufficient to state a plausible claim under the IHLPA.

Ocwen also argues that Plaintiffs have failed to sufficiently plead they complied with the notice prerequisite. However, Plaintiffs state that they have "notified the Homeowners Protection Unit of the alleged violation pursuant to IC 24-9-5-4( e)(1)" (Dkt. ¶343) which is specific enough to pass muster at this stage.  The Plaintiffs have not responded to Ocwen's motion to dismiss on this Count and Ocwen argues that they have conceded these points.  This matter is at the pleadings stage and the Court must determine whether the Plaintiffs' IHLPA claim is sufficiently pled.  Even if the Plaintiffs have "conceded" the points made by Ocwen in its motion to dismiss, the Amended Complaint nonetheless states a plausible claim under the IHLPA and will not be dismissed.

There is one point that Ocwen makes which is well taken. The IHLPA defines a "mortgage transaction" as one that involves a mortgage on real estate in Indiana" and a "real estate transaction" as a sale or lease of real estate that is located in Indiana.  Ind Code §24-9-3-7 (a)(2) and (b).  Wilhold's property is located in Illinois (¶205) and thus it is recommended that Wilhold's claim under this count be dismissed.

### G.  Contempt and Sanctions - Section 524 and  Rule 3002.1 (Count VII)

### 1.  No Private Right of Action and Enforcment of Section 524 Through Section 105

Plaintiffs have brought this case to challenge the bankruptcy post-petition fees and expenses assessed by Ocwen during the Plaintiffs' respective bankruptcy proceedings.  The Bankruptcy Code requires mortgagees of a debtor's personal residence to provide notice of fees and expenses being charged to the debtor, to the Court, the debtor and the trustee.  It also offers the debtors and trustees opportunity to object to the imposition of the fees and charges.  The parties do not dispute the

meaning or intent of Rule 3002.1, Notice Relating to Claims Secured by Security Interest in the Debtor's Principal Residence:

> (c) Notice of fees, expenses, and charges. The holder of the claim shall file and serve on the debtor, debtor's counsel, and the trustee a notice itemizing all fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, and (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence. The notice shall be served within 180 days after the date on which the fees, expenses, or charges are incurred.

Rule 3002.1, Fed. R. Bankr.P.

Mortgagees do not always comply or fully comply with the Rule, as is alleged by the four Plaintiffs in this case. Violations can occur in many different ways. The mortgage holder can fail to give notice at all, it can give notice incorrectly or fees and expenses can be found to be excessive whether notice was properly given or not. The Plaintiffs allege Ocwen (later known as PHH Mortgage Servicing) gave no notice of the fees and expenses it charged the debtors during the pendency of their bankruptcy cases. In some cases Ocwen failed to object to a Notice of Final Cure Payment when a delinquency existed, thus setting the debtors up for unexpected fees and expenses reflected in increased mortgage balances and escrow shortages after receiving discharges of their debts. The issue that presents itself in this case is whether the debtor-plaintiffs have a private right of action to sue the mortgage company for violation of the discharge injunction or if they must return to the bankruptcy court which entered the discharge injunction and pursue a contempt action there.

Plaintiffs argue that the trend to require debtors to return to their respective bankruptcy courts is "largely derivative of the district courts preference that bankruptcy matters be resolved by bankruptcy courts". They also state that the "core" nature of 11 USC § 524 is a "superficial formality" about the manner in which a debtor may seek relief. Further, Plaintiffs point out that their adversary proceeding as filed also contains allegations of contempt. So, Ocwen's Motion to Dismiss partially rests upon two theories: whether the Plaintiffs must prosecute their claims as contempt actions or may proceed as adversary proceedings and whether the cause of

action must be brought before the bankruptcy court where the debtor's bankruptcy was adjudicated. *Cox v Zale Delaware, Inc.,* 239 F3d 510 (7th Cir. 2001) is cited by Ocwen for the proposition that there is no private right of action via 11 U.S.C.§105 for a violation of §524[28], the discharge injunction. Debtor had entered into a reaffirmation agreement with Zale, which Zale failed to file with the court. A reaffirmation is not binding unless filed with the court.[29] Debtor proceeded to complete the terms of the unenforceable reaffirmation agreement and kept the collateral for the debt, despite not knowing the agreement had not been filed with the Court and was not enforceable until after the debt was paid in full. In *Cox,* Judge Posner states "…a suit for violation of section 524(c) can be brought only as a contempt action under section 524(a)(2)". Plaintiffs waive off any relevance of Posner's analysis because it was the debtor who interjected the issue and it was of so little significance, in their opinion, it wasn't fully briefed. Plaintiffs argue that Posner's failure to discuss Plaintiffs' theory that a discharge injunction is less individualized than other injunctions and therefore not subject to the same procedural requirements as other injunctions are, reflects a lack of precedential value of the holding. In this Court's opinion the lack of discussion means nothing more than the issue wasn't raised or Judge Posner didn't find it worthy of inclusion, and nothing more substantive can be assumed. However, while Posner's opinion is cited frequently, it still leaves open for discussion the unique nature of the statutory injunction. *Cox* also declared that debt-affirmation violations are a matter exclusively for the federal bankruptcy law and therefore state law claims are "extinguished". The argument can fairly be made that *Cox* does not speak to preclusion or preemption of unjust enrichment and other state claims under discharge injunction violations and is limited to reaffirmation agreement violations.

*Bessette v AVCO Financial Services, Inc.,* 230 F3d 439 (1st Cir. 2000) is a First Circuit case predating *Cox* . *Bessette* was also a reaffirmation agreement violation.

---

[28] In this section, any citation to a statutory paragraph is intended to cite to Title 11, the Bankruptcy Code.
[29] §524(c)(3).

Unlike *Cox*, *Bessette* dealt with abusive practices of obtaining the debtor's agreement to reaffirm an otherwise dischargeable debt, depriving debtor of his fresh start. *Bessette* addressed whether there exists a private right of action for damages or sanctions under §524, initially finding that the use of §105 to enforce another provision of the Code is proper. The Court found that it is clear "that a bankruptcy court is authorized to invoke §105 to enforce the discharge injunction imposed by § 524 and order damages …if the merits so require." However, this Court found that enforcement through contempt proceedings is not limited to the issuing court because it is a statutory injunction and few of the practical reasons for confining contempt proceedings to the issuing court apply. The Court went even further and said that the availability of class action certification is the same in bankruptcy court as it is in district court. However, the *Bessette* court also found that since § 105 is available to enforce § 524 and award damages and attorney fees, any state law claim for unjust enrichment is preempted by the Code. Preemption can be found under one of two circumstances. First, where the federal statutory scheme is so pervasive that Congress clearly intended to "occupy the field" to the exclusion of state law or second, where a particular state law is in direct conflict with the federal law to an extent that the statutes cannot coexist. Citing*, Summit Inv. & Dev. Corp. v Leroux,* 69 F3d 608, 610 (1st Cir. 1995) and *MSR Exploration Ltd., v Meridian Oil, Inc.,* 74 F3d 910, 913 (9th Cir. 1996).

A very recent case out of the Fourth Circuit, appealing a summary judgment, *Guthrie v. PHH Mortgage Corporation*, No. 22-1248, 2023 WL 5312885, (4th Cir. August 18, 2023) was decided August 18, 2023. It holds consistently with most other Circuits, that there is no private right of action for violation of the discharge injunction. "While there is not a private cause of action for violating the injunction, a bankruptcy court may, under § 105, impose contempt of court sanctions." Gutherie surrendered his real estate during his bankruptcy proceeding yet continued to be contacted by the mortgage servicer, PHH Mortgage Corporation, for repayment of the loan. Gutherie sued PHH for improperly contacting him and attempting to collect

36

the debt and misreporting of his credit status. The Fourth Circuit examined the interplay between the Bankruptcy Code and other state laws and determined that there was no express preemption of state laws, no field preemption of state laws and no direct conflict preemption. However, there is a strong dissent regarding preemption of state law claims. The dissent argued that any claim premised on a violation of the discharge injunction is preempted by the Bankruptcy Code because bankruptcy law is particularly federal in nature and is the product of the Constitution granting the express power to enact "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, §8, cl. 4. The Code is "incredibly detailed, 'provid[ing] a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights." *E. Equip. & Servs. Corp. v Factory Point Nat'l Bank,* 236 F3d 117, 120 (2d Cir. 2001). The dissent acknowledged that the sister circuits are unanimous in holding that state-law claims alleging violations of the automatic stay are preempted. There is no apparent reason why state law claims alleging violations of the discharge injunction should be any different. A principal purpose of the Code is to centrally locate disputes over a debtor's property and obligations.

Another very recent case, *Buenviaje v Charnetsky*, No. 5:21-cv-1903, 2023 WL 5216188, (C.D.Cal. June 29, 2023) likewise determined that §105 does not create a private right of action to sue for damages to enforce provisions of the bankruptcy Code. A private right of action must be created by Congress. *Alexander v Sandoval,* 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress").

It is undisputed that class action proceedings may be maintained in bankruptcy court when otherwise appropriate. Fed. R. Bankr. P. 7023 makes Fed. R. Civ. P. 23, "Class Actions", applicable to bankruptcy cases. *Walls v. Wells Fargo Bank, N.A.* 262 B.R. 519 (2001). Plaintiff alleged that Ocwen violated §524 and asked for class certification. After discussion of the requirements of a class action, the court denied the request, finding that the questions of law and fact are different among

class members but citing to *Bessette* and *In re Noletto*, 244 B.R. 845 (Bankr.S.D.Ala.2000) for the proposition that a class action is capable of being maintained for a §524 discharge injunction violation. There is also no dispute that §105 grants bankruptcy courts broad equitable powers to enforce other Code provisions and to generally preserve the integrity of the Bankruptcy system. It is axiomatic that Fed. R. Bankr. P.3002.1(i) furnishes bankruptcy courts with the equitable power to impose sanctions when justified to vindicate violations of the Rule. So, the question is not whether bankruptcy courts can impose sanctions, even through the vehicle of a class action, but only when the named plaintiffs can otherwise maintain such an action in that same court.

Our inquiry turns to the propriety of these named Plaintiffs maintaining a class action for violations of the discharge injunctions entered by different courts. *Peeples v. Blatt,* No. 00 C 7028, 2001 WL 921731 (N.D.Ill. August 15, 2001) involved post-discharge efforts to secure redemption agreements through repossession of the collateral securing the discharged debts, which plaintiffs alleged violated the discharge injunction. *Peebles* followed *Cox* and found that the sole remedy, at least in the Seventh Circuit, for violation of §524 is a contempt action brought in the court that issued the order of discharge.

*Dougherty v. Wells Fargo Home Loans, Inc.*, 425 F.Supp.2d 599 (2006), agreed with *Joubert v ABN AMRO Mortgage Group, Inc,* 411 F3d 452 (3d Cir 2005) in finding that §105 does not create a private right of action for violations of §506(b). Both cases sought to bring a separate lawsuit against the mortgage company for charging excessive fees during the pendency of the bankruptcy and in both cases the Court found that whether the Complaint is based on violations of §524 or §506, the reasoning is the same.

The cases overwhelmingly, but not unanimously, determine that enforcement of the provisions of §524 require the bringing of a contempt action in the court where the discharge injunction was issued. See, *In re Harlan*, 402 B.R. 703 (Bankr. W.D.Va.2009) ("Absent an express remedy, a violation of the post-discharge

38

injunction may only be sanctioned through a proceeding for civil contempt").  This is particularly true in the Seventh Circuit.  See *Asufrin v. Roundpoint Mortgage Servicing Corporation*, No. 15 C 9077, 2016 WL 1056669; (N.D.Ill. March 17, 2016). (in the Seventh Circuit, "the sole remedy for a violation of §524 is a contempt action brought in the bankruptcy court that issued the order, citing *Cox* and *Peeples*); *Freeman v. Ocwen Loan Servicing at *16* (debtor's "available remedy lies in the Bankruptcy Court that issued the Discharge Injunction"); *Bruce v. Citigroup Inc.,* 75 F.4th 297, 303 (2nd Cir. 2023) (contempt powers of the bankruptcy court "incorporate traditional standards in equity practice, citing *Taggart v Lorenzen,* 139 S. Ct. 1795, 1799 (2019); *Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186 (9th Cir. 2011) (affirming a district court's holding that § 105(a) did not provide a private right of action for the enforcement of discharge injunctions outside of contempt remedies).  In line with the prior holdings of the Seventh Circuit, this Court finds that there is no private right of action for a discharge violation nor is there a basis for a class action, except for injunctions issued within the same court.

O'Flynn's bankruptcy case was filed in this district, the Southern District of Indiana, on November 6, 2012 and proceeded in this Bankruptcy Court under case number 12-13117-RLM-13 (Dkt. 86 ¶.127).  The Addison bankruptcy case was filed in this district, the Southern District of Indiana, on August 21, 2014 and proceeded in this Bankruptcy Court under case number 14-7857-RLM-13 (Dkt. 86 ¶.215).  Both O'Flynn's and Addisons' contempt actions shall remain in this Court for further proceedings consistent with the section 524 violation contempt actions.

The Novak bankruptcy case was filed in the Northern District of Indiana on March 10, 2011 and proceeded under case number 11-20744-kl (Dkt. 86 ¶ 149). Wilhold filed his bankruptcy case on May 22, 2014 in the Bankruptcy Court Southern District of Illinois under case number 14-30858 (Dkt. 86 ¶188).  Since the Novak and Wilhold bankruptcy cases are closed, those cases must be reopened on the respective bankruptcy dockets before this Court could transfer this Count of the Amended Complaint to the Court with jurisdiction to hear the contempt or discharge injunction

39

violation. Therefore, the contempt proceedings are hereby dismissed without prejudice to refiling in the court where their bankruptcies were adjudicated.

### H. Unjust Enrichment (Count VIII)

Both Ocwen and AltiSource move for dismissal of Plaintiffs' state law unjust enrichment claims. Both Ocwen and AltiSource maintain that Plaintiffs' claims are preempted by the Bankruptcy Code. Ocwen further argues that Plaintiffs' unjust enrichment claim fails because their rights are governed by contract. (Dkt. 94 page 27 of 63); (Dkt.. 94 page 49 of 63). AltiSource maintains that Plaintiffs have not sufficiently pled that a measurable benefit was conferred upon Altisource. (Dkt. 97-1 Page 38 of 42) and that "they do not allege that they expected to receive payment from Altisource." (Dkt. 97-1, page 38 of 4).

"A claim for unjust enrichment is an equitable claim that arises when a party (1) receives a benefit; (2) the benefit is to the plaintiff's detriment; and (3) the defendant's retention of that benefit would be unjust." *In re Knox*, 237 B.R. 687, 701 (Bankr. N.D. Ill 1999) *citing TRW Title Ins. Co v. Security Union Title Ins. Co.*, 153 F.3d 822 (7th Cir.), reh'g denied, (1998). In Indiana, a plaintiff must show that he rendered a benefit to the defendant at the defendant's express or implied request, that the plaintiff expected payment from the defendant, and that allowing the defendant to retain the benefit without restitution would be unjust. *Reed v. Reid*, 980 N.E.2d 277, 298 (Ind. 2012).

#### 1. Preemption

As the Court noted in its discussion of the discharge injunction under Count VII, , a federal law can preempt, and therefore displace state law. See *In re Repository Technologies, Inc.*, 601 F.3d 710, 722  (7th Cir. 2010),quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008). ([c]omplete preemption 'confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim.) Some courts have described the extensive

nature of the Bankruptcy code as so expansive it "preempts virtually all claims relating to misconduct in the bankruptcy courts." *In re Knox*, 237 B.R. 687, 701 (Bankr. N.D. Ill. 1999) (citation omitted). The Code may also preempt state law when "an actual conflict exists between a specific provision of the Bankruptcy Code" and a state law. *In re Waggett*, 09-4152-8-SWH, 2015 WL 1384087, at *6 (Bankr. E.D.N.C. Mar. 23, 2015) citing *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 93 (Bankr.E.D.Va.1995). Preemption bars claims that are based on "violations of the Bankruptcy Code for which the Code itself and Rules provide other remedies." *Knox*, 237 B.R. at 702.

Ocwen cites to *Knox*, to support dismissal of an unjust enrichment claim based on violations of the Code. In *Knox*, a chapter 13 debtor filed an adversary proceeding alleging that a creditor routinely and intentionally filed proofs of claim in chapter 13 cases that inflated and misrepresented the value of its collateral. The plaintiffs there argued that, because claims are allowed if not objected to under §502, the filing of an inflated claim resulted in either allowance of the claim or forcing a debtor to incur fees to object to the claim.

The court dismissed the debtor's unjust enrichment claim, finding that it was preempted by the Bankruptcy Code. The court reasoned that the Bankrutpcy Code required a secured creditor to file a claim and §506 governed the method by which a claim was to be valued. Thus, the plaintiff's unjust enrichment claim sought a remedy which was provided for in the Bankruptcy Code and Rules and thus was "intricately related and wholly dependent on" violations of the Bankruptcy Code. *Id.* The court found that, "[w]here a federal statute was applicable, and had its own enforcement scheme and separate adjudicate framework, it must supersede any state law remedy." *Id.* (quoting *In re Shape, Inc.*, 135 B.R. 707, 708 (Bankr. D. Me. 1992)).

The Plaintiffs allege they may recover under a theory of unjust enrichment due to Defendants' "wrongful acts and omission of material facts" and that "Defendants have collected fees, costs and charges from Plaintiffs that were uncollectible" and "charged in relation to services not actually rendered." (Dkt. 86, 366-67). Ocwen

argues that Plaintiffs' complaint challenges the collectability of fees, charges, and costs *because* they were discharged, meaning that the appropriate remedy would be for an order of contempt for violating the discharge injunction. (Dkt. 94, page 29 of 63). AltiSource makes similar citation to language in Plaintiffs complaint alleging violations of the discharge injunction. (Dkt. 97-1 page 37 of 42).

Plaintiffs argue that the unjust enrichment claim is not preempted because the "Bankruptcy Code does not generally preempt state law" and the "Bankruptcy Code and a state law must be inconsistent and unable to coexist" for preemption to occur. Dkt. 769, Page 18 of 21. In support of this Plaintiffs cite to a slew of opinions from various jurisdictions where state law claims were maintained in bankruptcy proceedings. See *Sears, Roebuck and Co. v. O'Brien*, 178 F.3d 962 (8th Cir. 1999)[30] (finding the Bankruptcy Code did not preempt state law which prohibited a creditor from sending collection letter to a debtor represented by counsel). However, the facts in *Sears* is distinguishable from the facts of this case. In *Sears* the creditor's act of sending a letter to a debtor was a violation under a state statute that was independent of any bankruptcy code section or rule.

The factual allegations to each of the Plaintiffs consists of the same common facts, a chapter 13 debtor files for bankruptcy and during the pendency of the bankruptcy, the trustee files a Notice of Final Cure Payment, to which Ocwen files a response agreeing that any prepetition default has been cured and that petitioner had completed payments; thus the mortgage is reinstated according to the original terms and any amounts arising prior to bankruptcy were extinguished; however after exiting bankruptcy Plaintiffs' home mortgages were still viewed as deficient and Ocwen began collecting fees and costs associated with that status. Thus, at the core of the fees that were collected by the Defendants are fees that should have been

---

[30] Plaintiffs incorrectly cite this case as from the 7th Circuit, when in fact it is from the 8th Circuit. Dkt. 176 page 18 of 21. The court only takes notice of this as it was the only published case from the circuit offered to support Plaintiffs argument that unjust enrichment claim is not preempted by the Bankruptcy Code.

disclosed in Ocwen's response to the Trustee's Notice of Final Cure Payment and/or in a Notice of Fees, Expenses and Charges under Fed. R. Bankr. P. 3002.1(c).

Fed.R. Bankr. P. 3002.1(i) provides a remedy for a creditor's failure to provide information with respect to a Notice of Final Cure Payment or a Notice of Fees, Expenses and Charges and §524 provides a remedy for the collection of discharged debts. The Plaintiffs themselves acknowledge the close nexus between their claims against the Defendants and the provisions of the bankruptcy code and rules in that they accuse Defendants of the "creation and collection of improper fees, costs, charges and other amounts *in circumvention of the protections afforded to debtors by the Bankruptcy Code.*" (Dkt. 86 page 2 of 65) (emphasis added) and further argue that jurisdiction is proper because the complaint "concerns Defendants' willful violation and international failure to comply with this Court's orders implementing the discharge injunction." (Dkt. 86 page 3 of 65). Since the state law claim for unjust enrichment is intricately related and wholly dependent on violations of the Code and Rules, it is preempted. See *Inorio v. Wells Fargo Bank*, 522 F.Supp.3d 417, 423 (N.D. Ill. 2021) (dismissing as preempted when, "[c]learly, absent a violation of the Bankruptcy Code such a cause of action would not exist.") The court therefore recommends dismissal of the unjust enrichment claim on the basis that it is preempted by the Bankruptcy Code and Rules.

## I. **Voluntary Payment Doctrine**

Ocwen asserts that the Plaintiffs are not entitled to recover what they paid to it under the voluntary payment doctrine. The voluntary payment doctrine is an affirmative defense and a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses. The Plaintiffs in their response argue that dismissal of their claims based on Ocwen's use of this affirmative defense is improper and that application of the doctrine is better suited to a motion for summary judgment that challenges the merits, and not the sufficiency, of the complaint. (Dkt. 177, page 66 of 68). While "winning dismissal" based on an affirmative defense is "an uphill battle", dismissal is appropriate if the complaint's factual allegations unambiguously

establish all the elements of the defense and the plaintiff has "affirmatively plead himself out of court". *Morsberger v. ATI Holdings, LLC*, Case No. 22 C 1181, 2023 WL 2711754 at *6 (N. D. Ill. March 30, 2023). The Plaintiffs maintain that their payments to Ocwen were involuntary and based on fraudulent concealment, citing *Lawson v. First Union Mortgage Co.*, 786 N.E.2d 279, 284 (Ind. Ct. App. 2003). *Lawson* articulated the general rule that a voluntary payment could not be recovered back, even if made under a mistake or ignorance of the law, if it was made with full knowledge of all the facts and not induced by any fraud or improper conduct on the part of the payee. If the payee induced the payor to pay by fraud or improper conduct, then, the doctrine did not apply and the payment could be recovered.

The Indiana Supreme Court recalibrated the voluntary payment doctrine less than a year after the *Lawson* case was decided in *Time Warner Entertainment Co., L.P. v. Whiteman,* 802 N.E.2d 886 Ind. 004). The then-tentative draft of comment e to Section 6 of the Third Restatement of Restitution and Unjust Enrichment provided, in part, that:

> A more appropriate statement of the voluntary-payment rule, therefore, is that money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, *on the ground of "mistake",* merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation.

*Time Warner*, 802 N.E.2d at 892. (emphasis added). The Indiana Supreme Court adopted this language, holding that the voluntary payment doctrine's scope was limited to instances in cases of mistake where money was "voluntarily paid in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient." *Id.* at 893. See also, *CSX Transportation, Inc. v. Appalachian Railcar Services, Inc.*, 509 F.3d 384, 387 (7th Cir. 2007). While *Time Warner* may have tweaked the the voluntary payment doctrine, nothing in that case suggested that this recalibration affected the doctrine where fraud is alleged. Indeed, "any inducement by fraud or improper conduct" continues to be a factor in applying the

doctrine. See, *Jeppesen v. New Century Mortgage Corporation*, No. 2:05-cv-372-RL-PRC, 2006 WL 8452667 at *2 (N. D. Ind. September 12, 2006).

The Court has recommended in its discussion of the FDCPA and the IDCSA counts that the Amended Complaint pleads sufficient facts, if taken as true, that establish that Ocwen engaged in fraudulent conduct that tolled the statute of limitations. Those same facts provide a basis that Ocwen engaged in fraudulent or improper conduct in requesting payment and that the voluntary payment doctrine does not apply. Regardless, the doctrine is an affirmative defense and Ocwen has not unambiguously shown that it has established the elements of this affirmative defense. Whether the doctrine applies is better left to consideration on the merits, not this pleadings stage.

## J. Recommendation

Accordingly, the Court recommends that the District Court find that the Notice and Cure provisions of the Novak and Wilhold mortgages preclude their recovery on Counts III, IV, V, and VI EXCEPT as those counts relate to inaccurate reporting to credit reporting agencies. And, the Court makes the recommendations as to other parties and counts as detailed below.

In the event the District Court determines that the Notice and Cure provisions of the mortgages do not preclude recovery by Novak and Wilhold, the Bankruptcy Court recommends as follows:

(1)     The Defendants' motion as to Count I and II (RICO) be GRANTED and those counts be DISMISSED;

(2)     Ocwen's motion as to Count III (FDCPA) be GRANTED ONLY as to Novak; and DENIED in all other respects;

(3)     Ocwen's motion as to Count IV (RESPA) be GRANTED as to O'Flynn and DENIED in all other respects;

(4)     Ocwen's motion as to Count V (IDCSA) be GRANTED as to Wilhold and DENIED in all other respects;

(5)     Ocwen's  motion as to Count VI (IHLPA) be GRANTED as to Wilhold and DENIED in all other respects;

(6)     The Defendants' motion as to Count VIII (unjust enrichment) be GRANTED,

Further, since this Court has subject matter jurisdiction over the discharge injunction violations as to all four named cases, this Court dismisses Novak's and Wilhold's Count VII claims without prejudice and invites them to reopen their bankruptcy cases and file a sanctions motion against Ocwen for violation of the discharge injunction. As to O'Flynn and Addison, this Court retains jurisdiction over their request for sanctions against Ocwen for violation of the discharge injunction only and that matter will proceed in this Court in due course.